[No. S113136. Aug. 5, 2004.]

BRONCO WINE COMPANY et al., Petitioners, v.
JERRY R. JOLLY, as Director, etc., et al., Respondents;
NAPA VALLEY VINTNERS ASSOCIATION, Intervener.

944

948

**COUNSEL**

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer; Ropes & Gray, Peter M. Brody and Kelly B. Kramer, for Petitioners.

Hinman & Carmichael, John A. Hinman, Beth Aboulafia and Barry Strike for 68 wineries, 47 winegrowers and 3 interested parties as Amici Curiae on behalf of Petitioners.

Bill Lockyer, Attorney General, David S. Chaney, Assistant Attorney General, Damon M. Connolly, Miguel A. Neri, Fiel Tigno and Terry Senne, Deputy Attorneys General, for Respondent.

Dickenson, Peatman & Fogarty, Richard P. Mendelson, Deborah E. Quick; Keker & Van Nest, John W. Keker, Henry C. Bunsow, James M. Emery, Ragesh K. Tangri, Daniel Purcell; Horvitz & Levy and Ellis Horvitz, for Intervener.

Pillsbury Winthrop, Kevin M. Fong and James M. Seff for Jordan Vineyard & Winery and North Coast Winegrowers Association et al., as Amici Curiae on behalf of Respondent and Intervener.

## OPINION

**GEORGE, C. J.**—This case concerns three brand-name labels (Napa Ridge, Napa Creek Winery, and Rutherford Vintners) appearing on wine bottled and marketed by petitioners Bronco Wine Company and Barrel Ten Quarter Circle, Inc. (hereafter Bronco). These wines are made not from grapes grown in Napa County, or in the Rutherford viticultural (wine grape growing) region of Napa County,[1] but instead from grapes grown in areas far from Napa, such as Stanislaus County and the environs of the City of Lodi—areas where the cost of grapes, and often their perceived quality as well, is considerably lower. The challenged bottle labels have been approved by the federal agency charged by Congress with enforcing federal labeling law but violate a four-year-old California wine labeling statute, which requires that, when the word "Napa" (or any federally recognized viticultural region within Napa County) appears on a brand label, at least 75 percent of the grapes used to make that wine must be from Napa County. (Bus. & Prof. Code, § 25241 (hereafter section 25241).) We granted review to consider the Court of Appeal's conclusion that federal law preempts the state law. We conclude that the state labeling statute is not preempted by federal law and hence that the judgment rendered by the Court of Appeal must be reversed.

### I.

Bronco asserts that it specializes in "premium wines at affordable prices." Some of Bronco's wine is bottled at its facilities in Ceres (near Modesto, in Stanislaus County) and in Sonoma County; other Bronco wines are bottled by petitioner Barrel Ten Quarter Circle, Inc., at a recently completed facility in the City of Napa, in Napa County. The latter plant is capable of producing approximately 18 million 12-bottle cases per year—output that would be more than double the current annual production of Napa-grown wines.

---

[1] Rutherford is a federally recognized viticultural region located within Napa County. (27 C.F.R. § 9.133 (2003); all further citations to the Code of Federal Regulations are to the 2003 edition unless otherwise indicated.)

Bronco sells wines under approximately 30 labels or brand names. A representative label for the three challenged brand names (Napa Ridge, Napa Creek Winery, and Rutherford Vintners) is set forth in the appendix.[2] As can be seen, with regard to the representative Napa Ridge label, the label lists (in smaller lettering and below the brand name) the "designation" of the wine (the varietal name White Merlot), followed underneath by the "appellation of origin"—the geographic source of the grapes (Lodi). The representative Napa Creek Winery label lists (in smaller lettering and below the brand name) the appellation of origin (Lodi), followed underneath by the varietal name (Chardonnay). The representative Rutherford Vintners label lists (in smaller lettering and below the brand name) the appellation of origin (Stanislaus County), followed underneath by the varietal name (Merlot). The "back label" of each states that the wine was "vinted and bottled" by the named winery in "Napa, CA" or in "Napa, California."[3] In addition, many of the Napa Ridge wines include the word "Napa" on bottleneck collars, and some include that word on branded corks.

Bronco acquired these three brand names, and the right to use these labels, from predecessor owners of wineries located in Napa County. The Napa Ridge brand, which Bronco acquired in January 2000 from Beringer Wine Estates for more than $40 million, had been in use since the early 1980s. The Napa Creek Winery brand, introduced in 1981, was acquired by Bronco in 1993. The Rutherford Vintners brand originated in the early 1970s, and was acquired by Bronco in 1994.

The prior owner of the Napa Ridge brand had used that name and label for wines made from grapes grown in California's Central Coast, North Coast, and Lodi appellation areas, as well as from Napa County. All of the wines previously marketed by the prior owner under the Napa Creek Winery brand and most wines previously marketed by the prior owner under the Rutherford Vintners brand had been made from Napa County grapes. Under Bronco's

---

[2] The labels set forth in Bronco's appendix to the petition for writ of mandate are divided into sections for each of the three brand names. The labels selected for description below and displayed in the appendix to our opinion are the first from each section.

[3] The word "vinted" is used when wine is fermented at one address and thereafter subjected to "cellar treatment" (such as filtering) at a different address stated on the label. (See 27 C.F.R. § 4.35a(a)(3)(iii) & (v).) Each back label also contains a further statement concerning the appellation of origin. The Napa Ridge back label states: "This White Merlot, from the Lodi Region of Northern California, starts with an enticing aroma of strawberry and cherry . . . ." The Napa Creek Winery back label states: "From vineyards blessed by the warm days and cool nights of California's famed Lodi viticultural area, our Chardonnay is well structured with complex flavors from partial barrel fermentation. . . ." The Rutherford Vintners back label reads: "These grapes were harvested from the lush vineyards of Stanislaus County. . . ."

ownership, all three of these brands have been used almost exclusively to sell wines made from grapes grown outside Napa County.

The bill that became section 25241 was introduced in the California Legislature in February 2000 (Assem. Bill No. 683 (1999–2000 Reg. Sess.)). After receiving substantial public comment and holding hearings,[4] the Legislature found: "(a)(1) . . . [F]or more than a century, Napa Valley and Napa County have been widely recognized for producing grapes and wine of the highest quality. Both consumers and the wine industry understand the name Napa County and the viticultural area appellations of origin contained within Napa County (collectively 'Napa appellations') as denoting that the wine was created with the distinctive grapes grown in Napa County. [¶] (2) The Legislature finds, however, that certain producers are using Napa appellations on labels, on packaging materials, and in advertising for wines that are not made from grapes grown in Napa County, and that consumers are confused and deceived by these practices. [¶] (3) The Legislature further finds that legislation is necessary to eliminate these misleading practices. It is the intent of the Legislature to assure consumers that the wines produced or sold in the state with brand names, packaging materials, or advertising referring to Napa appellations in fact qualify for the Napa County appellation of origin." (§ 25241, subd. (a), added by Stats. 2000, ch. 831, § 1.)[5]

■ The resulting legislation, section 25241, provides in relevant part that no wine produced or marketed in California shall use a brand name or have a label bearing the word "Napa" (or any federally recognized viticultural area within Napa County) unless at least 75 percent of the grapes from which the wine was made were grown in Napa County. (*Id.*, subd. (b).)[6]

---

[4] The Legislature heard evidence of intent, or at least willingness, to expand dramatically the marketing of Napa-named brands, including the hope of fully utilizing the capacity of the new 18-million-case bottling plant in the City of Napa, to produce wine from grapes grown outside Napa County. (See transcript of Sen. Governmental Organization Com., hearings on Assem. Bill No. 683 (1999–2000 Reg. Sess.) (June 27, 2000) pp. 29 & 31 [responses to questions by Sen. Chesbro].)

[5] Bronco contests the Legislature's findings, asserting that labels such as those set out in the record are not in law or in fact deceptive because they display a correct appellation of origin. The Legislature's findings to the contrary, however, are supported both by testimony and survey results presented at the hearings disclosing consumer confusion relating to such labels. Moreover, as observed at the hearings, an uninformed consumer may not know that an unelaborated term (for example, Lodi) appearing on a label refers to a geographic location outside Napa County or even that the named location (in contrast to the brand name of the wine) signifies the place where the grapes used to make the wine actually were grown. Similarly, consumers in restaurants who order wine by the bottle or the glass from menus may be aware only of the brand name of the wine and generally will not have an opportunity to read the label of the bottle before placing an order.

[6] Section 25241 sets out in subdivision (a) the findings quoted above, and then provides: "(b) No wine produced, bottled, labeled, offered for sale or sold in California shall use, in a

■ The legislative history discloses that section 25241 was designed to close what some legislators termed a "loophole" created by an exception in a federal wine labeling regulation. As discussed more fully below, federal law, the Federal Alcohol Administration Act, or FAA Act (27 U.S.C. § 201 et seq.), enacted by Congress in 1935, bars misleading statements on wine labels (*id.*, § 205(e)) and requires federal approval of each label via a certificate of label approval (hereafter sometimes COLA) before that label may be used in interstate or foreign commerce. A 1986 federal regulation, also described more fully below, designed to implement 27 United States Code section 205(e), generally prohibits the use of a label bearing a brand name that implies the wine was made from grapes grown in the area suggested by the brand, unless at least 75 percent of the grapes used to make the wine were in fact grown in that area (27 C.F.R. § 4.39(i)(1)). But a "grandfather clause" appended to the federal regulation exempts from the federal regulation's prohibition an otherwise misleading geographic brand name if the brand name was in use prior to July 7, 1986, *and* the front label also discloses the true geographic source of the grapes used to make the wine

brand name or otherwise, on any label, packaging material, or advertising, any of the names of viticultural significance listed in subdivision (c), unless that wine qualifies under Section 4.25a [now section 4.25—see 68 Federal Register 39454, 39455 (July 2, 2003)] of Title 27 of the Code of Federal Regulations for the appellation of origin Napa County and includes on the label, packaging material, and advertising that appellation or a viticultural area appellation of origin that is located entirely within Napa County, subject to compliance with Section 25240.

"Notwithstanding the above, this subdivision shall not grant any labeling, packaging, or advertising rights that are prohibited under federal law or regulations.

"(c) The following are names of viticultural significance for purposes of this section:

"(1) Napa.

"(2) Any viticultural area appellation of origin established pursuant to Part 9 (commencing with Section 9.1) of Title 27 of the Code of Federal Regulations that is located entirely within Napa County.

"(3) Any similar name to those in paragraph (1) or (2) that is likely to cause confusion as to the origin of the wine.

"(d) The appellation of origin required by this section shall meet the legibility and size-of-type requirements set forth in either Section 4.38 or Section 4.63 of Title 27 of the Code of Federal Regulations, whichever is applicable.

"(e) Notwithstanding subdivision (b), any name of viticultural significance may appear either as part of the address required by Sections 4.35 and 4.62 of Title 27 of the Code of Federal Regulations, if it is also the post office address of the bottling or producing winery or of the permittee responsible for the advertising, or as part of any factual, nonmisleading statement as to the history or location of the winery.

"(f) The department may suspend or revoke the license of any person who produces or bottles wine who violates this section. Following notice of violation to the person in possession of the wine and a hearing to be held within 15 days thereafter, if requested by any interested party within five days following the notice, the department may seize wine labeled or packaged in violation of this section regardless of where found, and may dispose of the wine upon order of the department. From the time of notice until the departmental determination, the wine shall not be sold or transferred.

"(g) This section applies only to wine which is produced, bottled, or labeled after January 1, 2001."

contained in the bottle. (*Id.*, § 4.39(i)(2)(ii).)[7] In other words, the state statute prohibits, with respect to Napa County, what the federal regulation's grandfather clause does not prohibit.[8]

In late December 2000, shortly before section 25241 was to become effective, Bronco filed an original petition for a writ of mandamus in the Court of Appeal,[9] seeking to prohibit respondents (the Department of Alcoholic Beverage Control and its then Interim Director, Manuel R. Espinoza, currently Jerry R. Jolly, Director) (hereafter the Department) from enforcing section 25241 with respect to Bronco's wines, on the ground that the state

---

[7] 27 Code of Federal Regulations section 4.39(i) provides:

"(i) *Geographic brand names.* (1) Except as provided in subparagraph 2, a brand name of viticultural significance may not be used unless the wine meets the appellation of origin requirements for the geographic area named.

"(2) For brand names used in existing certificates of label approval issued prior to July 7, 1986:

"(i) The wine shall meet the appellation of origin requirements for the geographic area named; or

"(ii) The wine shall be labeled with an appellation of origin in accordance with § 4.34(b) as to location and size of type of either:

"(A) A county or a viticultural area, if the brand name bears the name of a geographic area smaller than a state, or;

"(B) A state, county or a viticultural area, if the brand name bears a state name; or

"(iii) The wine shall be labeled with some other statement which the appropriate ATF [Bureau of Alcohol, Tobacco and Firearms] officer finds to be sufficient to dispel the impression that the geographic area suggested by the brand name is indicative of the origin of the wine.

"(3) A name has viticultural significance when it is the name of a state or county (or the foreign equivalents), when approved as a viticultural area in part 9 of this chapter, or by a foreign government, or when found to have viticultural significance by the appropriate ATF officer."

[8] Bronco asserts that the statute was drafted in such a manner as to protect other established Napa County wineries, and to target "only a single brand owner—Bronco" (and its three grandfathered brands). The record discloses, however, at least 32 other Napa-related "grandfathered" brands (none of which, it appears, *presently* produces any wine that would violate section 25241) that also would be covered by the statute, including the "Napa named" brands Napa Wine Cellars, Napa Wine Co., Napa Cellars, Napa Valley Winery, Napa Vintners, and "Napa viticultural appellation" brands Rutherford Hill, Stag's Leap Wine Cellars, Stags' Leap Winery, Spring Mountain, Mount Veeder Winery, St. Helena Vineyards, and Oakville Vineyards.

Bronco also complains that the statute is underinclusive, in that it does not restrict the use of non-Napa brand names, such as "Monterey Vineyards" or "Sonoma Creek," nor does it preclude the use of brand labels denoting a viticultural area within Napa, such as the brand "Stag's Leap Wine Cellars," for a Napa County wine made with grapes grown outside the Stags Leap District of the Napa Valley. (Cf. Bus. & Prof. Code, § 25240 [requiring such labels to state a "Napa Valley" appellation in addition to the viticultural area within Napa Valley].) Any such underinclusiveness, however, is irrelevant to our present preemption inquiry.

[9] Business and Professions Code section 23090.5 divests the superior court of jurisdiction to enjoin or restrain a decision of the Department of Alcoholic Beverage Control, the agency charged with enforcing Business and Professions Code section 25241.

statute to the extent it applies to wine destined for interstate or foreign commerce is preempted by the grandfather clause contained in the federal law. Bronco also claimed that the California statute violates the First Amendment, the commerce clause, and the takings clause of the United States Constitution. Intervener Napa Valley Vintners Association (NVVA) joined with the Department in defending the validity of the state enactment. The Court of Appeal issued an alternative writ and granted a stay of enforcement of section 25241. As noted above, that court ultimately concluded that section 25241 is preempted by federal law, and to date that statute has not been enforced. We granted review to address the preemption issue only.

## II.

### A.

■ The basic rules of preemption are not in dispute: Under the supremacy clause of the United States Constitution (art. VI, cl. 2), Congress has the power to preempt state law concerning matters that lie within the authority of Congress. (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372 [147 L.Ed.2d 352, 120 S.Ct. 2288] (*Crosby*).) In determining whether federal law preempts state law, a court's task is to discern congressional intent. (*English v. General Elec. Co.* (1990) 496 U.S. 72, 78–79 [110 L.Ed.2d 65, 110 S.Ct. 2270].) Congress's express intent in this regard will be found when Congress explicitly states that it is preempting state authority. (*Jones v. Rath Packing Co.* (1977) 430 U.S. 519, 525 [51 L.Ed.2d 604, 97 S.Ct. 1305] (*Jones*).) Congress's implied intent to preempt is found (i) when it is clear that Congress intended, by comprehensive legislation, to occupy the entire field of regulation, leaving no room for the states to supplement federal law (*Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 67 S.Ct. 1146] (*Rice*)); (ii) when compliance with both federal and state regulations is an impossibility (*Florida Avocado Growers v. Paul* (1963) 373 U.S. 132, 142–143 [10 L.Ed.2d 248, 83 S.Ct. 1210] (*Florida Avocado*)); or (iii) when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines v. Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 61 S.Ct. 399] (*Hines*); see also *Crosby, supra,* 530 U.S. at p. 373; *Barnett Bank of Marion Cty., N.A. v. Nelson* (1996) 517 U.S. 25, 31 [134 L.Ed.2d 237, 116 S.Ct. 1103] (*Barnett Bank*); *Lawrence County v. Lead-Deadwood School Dist.* (1985) 469 U.S. 256, 260 [83 L.Ed.2d 635, 105 S.Ct. 695] (*Lawrence County*); *Capital Cities Cable, Inc. v. Crisp* (1984) 467 U.S. 691, 699 [81 L.Ed.2d 580, 104 S.Ct. 2694]; see also *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 923–924 [12 Cal.Rptr.3d 262, 88 P.3d 1] (*Dowhal*).)

In the present case, it is clear that Congress has not expressly preempted state authority with respect to the regulation of wine generally, or with

respect to wine labels in particular, and Bronco does not contend otherwise. Neither does Bronco contend that this is a case in which Congress has occupied the field and thus impliedly preempted the state statute here at issue. Nor does Bronco contend that implied preemption is shown because compliance with both federal and state regulations is impossible; as Bronco concedes, it can comply with the stricter state law and simultaneously comply with federal law. Instead, Bronco asserts that we should find implied preemption in this case because section 25241 stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[10] (Cf. *Dowhal, supra,* 32 Cal.4th 910, 929, 935 [state law warnings concerning nicotine frustrate the purposes of the federal Food, Drug & Cosmetic Act and corresponding federal regulations].)

As we shall explain, we disagree that section 25241 is impliedly preempted by federal law. In reaching this conclusion we first address Bronco's assertion that a presumption against preemption does not apply in this matter. (See *post,* pt. II.B.1.) After extensively reviewing the history of state regulation of beverage and wine labels prior to Congress's adoption of the FAA Act in 1935—a history that reveals substantial state involvement and very little federal regulation—we conclude that a presumption against preemption does indeed apply in this case. Next, we address the intent of Congress in enacting the FAA Act in 1935. (See *post,* pt. II.C.1.) The legislative history of that enactment reveals congressional intent, among other things, (i) to prevent the deception or misleading of consumers related to the labeling of wine and other alcoholic beverages, and (ii) to supplement—but not supplant—existing state regulation of the industry. We next consider the intent of the responsible federal regulatory agency vis-à-vis state regulation of wine brand labeling, as reflected in regulations and comments set out in the Federal Register. (See *post,* pt. II.C.2.) As we explain, the record reveals that the federal regulatory agency has long operated on the understanding that states may and would continue to impose their own stricter wine labeling regulations. Finally, we address the substantive issue of implied preemption of the particular state legislation at issue and conclude that the California statute in question does not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (See *post,* pt. II.D.)

## B.

The party who claims that a state statute is preempted by federal law bears the burden of demonstrating preemption. (See, e.g., *McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 422 [106 Cal.Rptr.2d 271, 21 P.3d

[10] Bronco suggests, however, that the state properly may "enact an 'in-state' version of section 25241"—a regulation that would, presumably, apply only with respect to wine that is not sold in interstate commerce.

1189], and cases cited.) ■ An important corollary of this rule, often noted and applied by the United States Supreme Court, is that "[*w*]*hen Congress legislates in a field traditionally occupied by the States, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'* " (*California v. ARC America Corp.* (1989) 490 U.S. 93, 101 [104 L.Ed.2d 86, 109 S.Ct. 1661], italics added (*ARC America Corp.*), quoting *Rice, supra,* 331 U.S. 218, 230; see also, e.g., *United States v. Locke* (2000) 529 U.S. 89, 107–108 [146 L.Ed.2d 69, 120 S.Ct. 1135] (*Locke*); *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [135 L.Ed.2d 700, 116 S.Ct. 2240] (*Medtronic*) [presumption applies both to the existence of preemption and the scope of preemption]; *Ray v. Atlantic Richfield Co.* (1978) 435 U.S. 151, 157 [55 L.Ed.2d 179, 98 S.Ct. 988] (*Ray*); *Jones, supra,* 430 U.S. 519, 525; *Florida Avocado, supra,* 373 U.S. 132, 146; *Allen-Bradley Local v. Board* (1942) 315 U.S. 740, 749 [86 L.Ed. 1154, 62 S.Ct. 820]; *Napier v. Atlantic Coast Line R. Co.* (1926) 272 U.S. 605, 611 [71 L.Ed. 432, 47 S.Ct. 207]; *Savage v. Jones* (1912) 225 U.S. 501, 533 [56 L.Ed. 1182, 32 S.Ct. 715] (*Savage*); *Reid v. Colorado* (1902) 187 U.S. 137, 148 [47 L.Ed. 108, 23 S.Ct. 92].) As explained in *Jones, supra,* 430 U.S. 519, 525, this venerable presumption "provides assurance that 'the federal-state balance,' . . . will not be disturbed unintentionally by Congress or unnecessarily by the courts." (Citation omitted; see *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 815 [135 Cal.Rptr.2d 1, 69 P.3d 927] (*Olszewski*).)

The Department and the NVVA assert that the state regulation at issue in this case directly implicates the traditional police powers of the states to protect consumers from deception in the marketing of food and beverages and to safeguard the integrity—and worldwide market—of a vital California industry. (See, e.g., *Florida Avocado, supra,* 373 U.S. 132, 146 [state police powers properly are employed both to protect consumers' health and to "prevent the deception of consumers"]; *Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 143 [25 L.Ed.2d 174, 90 S.Ct. 844] [recognizing a state's interest in protecting its reputation as a reliable source of authentic, high-quality goods in all markets where its goods compete].) Indeed, we observed as much concerning the California wine industry more than 100 years ago. (*Ex parte Kohler* (1887) 74 Cal. 38, 42–43 [15 P. 436] [state wine labeling statute, designed to protect the health of consumers and the integrity of the wine industry, was a proper exercise of the police power].)

Bronco and amici curiae on its behalf, Abundance Vineyards et alia.,[11] assert, however, that no presumption against preemption applies in this case because there is no evidence that states traditionally have exercised their police powers to regulate the labeling of wine.[12] Specifically, Bronco argues that prior to the August 1935 enactment of the FAA Act, 27 United States Code section 201 et seq., federal regulation of wine labeling was "well-established," whereas the activity of the states in that enterprise was "limited." Bronco maintains that "although the states have played a limited role in regulating wine labeling over the past century, the federal government's presence in that field . . . would negate the application of any presumption against preemption in this case." Amici curiae assert, similarly and more emphatically, that prior to enactment of the FAA Act in August 1935 "state and local authorities had exercised control over the *distribution* and *sale* of liquor" but that "it was the federal government that first comprehensively regulated the packaging and labeling" of wine.

The Department and the NVVA, on the other hand, point to early California statutes addressing wine labeling, isolated statements in treatises and legal articles, and statements in congressional reports and debates suggesting an intent by Congress in 1935 that the FAA Act, including 27 United States Code section 205(e) and the regulations that would be expected to flow therefrom, would supplement state regulation of wine labeling but not preempt it.

---

[11] Counsel for amici curiae represent, among other entities, more than 68 wineries in Alabama, Arizona, Arkansas, California, Georgia, Maine, Massachusetts, Michigan, New Jersey, New Mexico, New York, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Virginia, and Washington, as well as 47 wine grape growers in California.

[12] Bronco, relying upon two Eleventh Circuit Court of Appeals decisions (*Lewis v. Brunswick Corp.* (11th Cir. 1997) 107 F.3d 1494, 1502, and *Taylor v. General Motors Corp.* (11th Cir. 1989) 875 F.2d 816, 826), and, to a lesser extent, two high court decisions (*Geier v. American Honda Motor Co.* (2002) 529 U.S. 861, 870–874 [146 L.Ed.2d 914, 120 S.Ct. 1913] (*Geier*), and *Engine Manufacturers Association v. South Coast Air Quality Management District* (2004) 541 U.S. 246, 256 [158 L.Ed.2d 529, 124 S.Ct. 1756, 1763] (*Engine Manufacturers*)), also asserts, as a preliminary matter, that the presumption against preemption is categorically inapplicable in implied preemption cases such as this, in which the question is whether state law would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The United States Supreme Court has not so held, however, and indeed has assumed otherwise. (*Crosby, supra,* 530 U.S. 363, 373–374 & fn. 8.) *Geier,* by contrast, did not even address the presumption-against-preemption doctrine, and in *Engine Manufacturers* the court simply found it unnecessary, because of its conclusion that the federal legislation *expressly* preempted the relevant state law, to address the presumption against preemption or even the legislative history of the federal statute. We discern no persuasive reason why the traditional presumption against preemption should be categorically inapplicable in the present circumstances, and until the high court directs otherwise, we reject Bronco's view on this point. (See, e.g., *Philip Morris Inc. v. Harshbarger* (1st Cir. 1997) 122 F.3d 58, 85–86 [applying a "strong presumption against preemption" concerning state health and safety regulations and finding those regulations not to frustrate congressional purposes].)

Prior to oral argument we solicited supplemental briefing from the parties, asking them to address the effect, if any, of numerous additional state statutes and regulations disclosed in the course of our review of this case. Having considered those materials and the parties' supplemental briefs, we conclude below that the historic record amply supports the conclusion that a presumption against preemption applies in this case because the protection of consumers from potentially misleading brand names and labels of food and beverages in general, and wine in particular, is a subject that traditionally has been regulated by the states.[13]

### 1. *Regulation of wine labels prior to adoption of the FAA Act in August 1935*

Prior to the 20th century, federal legislation relating to wine and alcohol focused essentially upon revenue collection—specifically, enforcement of federal tax laws. (See Byse, *Alcoholic Beverage Control Before Repeal* (1940) 7 Law & Contemp. Probs. 543, 552, fns. 57 & 58 (*Alcoholic Beverage Control Before Repeal*).) By contrast, as disclosed below, widespread legislation enacted by states in the mid to late 19th century, and continuing through adoption of the FAA Act in August 1935, focused upon the substantive public problems of "adulteration" and "misbranding" (or "mislabeling") of wines and alcohol. This historic record supports the view that prior to adoption of the federal act in 1935, states vigorously exercised their police powers to regulate wine labeling.

### a. *The emergence of state "pure food" and labeling statutes*

During the latter half of the 19th century, awareness gradually increased throughout the nation concerning a combination of related problems in the supply of food and beverages. Some food and beverage products were mere imitations or dilutions of what they purported to be; other products, subject to spoilage, were "adulterated" by a "soaring employment of chemical preservatives." (Young, Pure Food (1989) p. 126.) Many of these preservatives—such

---

[13] At oral argument, as in the Department's briefs, the NVVA maintained that the "relevant area" for purposes of determining whether the presumption against preemption is applicable should be viewed as consumer protection related to the labeling of foods and beverages in general or, more specifically, as consumer protection related to the labeling of wines. Bronco, although generally challenging the appropriateness of applying any presumption against preemption in this case (see *ante*, fn. 12), does not contest the definition of the relevant area for such an inquiry as proposed by the Department and the NVVA. For purposes of this opinion, and consistently with the high court's approach in such matters (see, e.g., *ARC America Corp., supra,* 490 U.S. 93, 101 [in addressing whether federal antitrust law preempts state law, defining the relevant area as "state common-law and statutory remedies against monopolies and unfair business practices"]), we view the relevant area as being consumer protection related to food and beverage labeling, with special emphasis upon wine labeling.

as salicylic acid, employed as a preservative in wine (*id.*, at p. 105)—were used in excessive quantities dangerous to health. (*Id.*, at pp. 110, 112, 126.) As a result, it was found that more than "73 per cent of the milk in Buffalo [New York] was watered, 69 of 171 samples of ground coffee collected in New York were adulterated, 71 percent of the olive oils examined in New York and Massachusetts were mixed with cotton seed oil which had been shipped from the United States and returned as 'olive oil'[, and] [f]orty-six percent of candy samples collected in Boston contained mineral pigments, chiefly lead chromate." (Hart, *A History of the Adulteration of Food Before 1906* (1952) 7 Food Drug Cosm. L.J. 5, 21); see also McCumber, *The Alarming Adulteration of Food and Drugs* (Jan. 5, 1905) The Independent, 28, 29–31 [listing common adulterations of various products].) Wines too were subject to abuses. Some were "made from cheap substances and then doctored up." (Regier, *The Struggle for Federal Food and Drugs Legislation* (1933) 1 Law & Contemp. Probs. 3, 8.) Others were mislabeled as to place of origin. (Carosso, The California Wine Industry: A Study of the Formative Years (1951) p. 25 (California Wine Industry); see also Fanshawe, Liquor Legislation in the United States and Canada (1892) p. 308.)

In response to the general threat to the food and beverage supply, many if not most states exercised their traditional police powers to regulate generally the marketing of impure or deceptively labeled foods and beverages. (See, e.g., Dig. of Pure Food and Drug Laws, Sen. Rep. No. 3, 57th Cong., 1st Sess. (1901).)[14] The vast majority of the resulting general "pure food" statutes broadly covered liquors and wines, as well as the mislabeling of those products.

For example, in 1879 Wisconsin enacted a general pure food, drugs, and liquors statute, making it illegal to manufacture or sell any food (defined to include "drink"), accompanied by "any label, mark or device whatever, so as and with intent to mislead or deceive as to the true name, nature, kind and quality thereof . . . ." (1879 Wis. Laws, ch. 248, § 3, p. 502.) A similar labeling law was enacted in North Dakota. (1903 N.D. Laws, ch. 6, §§ 1–2, pp. 9–10; 1905 N.D. Laws, ch. 11, §§ 1–2, pp. 19–20.) An Ohio statute, enacted in 1884, made it illegal to manufacture or sell any food (defined to include drink) "if by any means it is made to appear better or of greater value than it really is," or if it contained any impure substance not "distinctly labeled" as such. (1884 Ohio Laws, § 3, p. 67; 1890 Ohio Laws, § 3, p. 248.) Substantially similar labeling statutes were enacted in Indiana, Massachusetts,

---

[14] Some state laws of this era regulated the production and labeling of specific items of food such as flour, butter, oleomargarine, and vinegar. (E.g., Hutt & Hutt, *A History of Government Regulation of Adulteration and Misbranding of Food* (1984) 39 Food Drug Cosm. L.J. 2, 42–44 [citing and describing early Virginia statutes].) During this same period, Congress enacted similar laws concerning specific food items such as tea, oleomargarine, and meats. (*Id.*, at pp. 45–46.)

Michigan, Pennsylvania, and Washington. (1899 Ind. Acts, ch. 121, § 1, pp. 189–190; 1882 Mass. Acts, ch. 263, §§ 1–3, pp. 206–207; 1895 Mich. Pub. Acts, No. 193, § 3, p. 358; 1895 Pa. Laws, No. 233, § 3, p. 317; 1899 Wash. Laws, ch. 113, §§ 1–3, pp. 183–184.) A Maryland statute, enacted in 1890, required that food or drink "be so manufactured . . . or sold, or offered for sale under its true and appropriate name" and required that the purchaser be "fully informed by the seller of the true name and ingredients . . . of such article of food or drink . . . ." (1890 Md. Laws, ch. 604, § 1, p. 733.) Similar laws were enacted in Connecticut, North Carolina, and Tennessee. (1895 Conn. Pub. Acts, ch. 235, §§ 1, 2, p. 578; 1895 N.C. Sess. Laws, ch. 122, §§ 1, 2, 5, pp. 176–178; 1897 Tenn. Pub. Acts, ch. 45, §§ 1, 4, pp. 177–178.) Finally, a New York statute (1893 N.Y. Laws, ch. 338), subsequently amended in 1903 and 1905, prohibited "adulterated or misbranded food." The statute defined as "misbranded"—and illegal—any food or beverage "package . . . or label" that bore "any statement regarding the ingredients or the substances contained therein, which statement [is] false or misleading in any particular, or if the same is *falsely branded as to the state or territory in which it is manufactured or produced* . . . ." (1903 N.Y. Laws, ch. 524, § 1, p. 1192, italics added; 1905 N.Y. Laws, ch. 100, § 1, p. 141.) A substantially identical labeling law was enacted in South Dakota. (1905 S.D. Laws, ch. 114, §§ 6, 8 & 10, pp. 162–163.)[15]

### b. *Early state wine labeling statutes*

As early as 1860, California enacted a statute to penalize the sale of "adulterated alcoholic or spirituous liquors, wines, cider, beer, or other liquid used as a beverage." (Stats. 1860, ch. 223, § 2, p. 186, currently Pen. Code, § 382.) But in the face of rampant deception in the labeling of wines— including the bottling of California wines under false foreign labels, and the bottling of inferior foreign wines under California labels (Cal. Wine Industry, *supra*, at p. 25) the California Legislature in 1866 passed a resolution asking Congress to enact nationwide legislation to curb the marketing of "spurious" and "imitation" wines and alcohols. (Sen. Conc. Res. No. 36, Stats. 1866 (approved Apr. 2, 1866) p. 908.) After much effort during the ensuing two decades, this endeavor ultimately failed in 1886. (See Cal. Wine Industry, *supra*, at pp. 154–155.)

---

[15] Citing only the 1895 North Carolina law, Bronco asserts that "some" of these state laws were intended to apply only to food and beverages sold within a given state. The North Carolina provision, however, is the only such law of which we are aware to have intimated or specified such a limitation; none of the other laws cited above was so confined, and most instead broadly applied to foods and beverages that were "manufactured for sale"—wherever that sale would occur. But in any event, the relevant point is that the states (most of them broadly, although in the case of North Carolina, narrowly) exercised their traditional police powers by specifically regulating the labeling of food products and beverages, including wines.

Congress's inability to adopt a nationwide wine regulation and labeling statute induced the three primary wine-producing states—California, New York, and Ohio[16]—as well as other states with lesser wine industries (such as Arkansas, Colorado, and Oregon)[17] to enact, under their traditional police powers, specific and detailed statutes tailored to the problems of impurity and deception in the production and labeling of wines.

California—then, as now, by far the leading producer of wine in the nation,[18] and an acknowledged leader in quality as well[19]—apparently was the first state to adopt such a statute, in March 1887. (Stats. 1887, ch. 36, p. 46; see *Ex parte Kohler, supra,* 74 Cal. 38, 42–43.) The California statute defined as "pure wine" that which was made from only pure grapes. (Stats. 1887, ch. 36, § 1, p. 46.) The statute further defined "[d]ry wine" as that produced by "complete fermentation of saccharine contained in [grape] must"; "[s]weet wine" as that which contains "saccharine appreciable to the taste"; "[f]ortified wine" as "wine to which distilled spirits have been added"; and "[p]ure champagne, or sparkling wine" as that which "contains . . . effervescence produced only by natural fermentation of saccharine matter of [grape] must, or partially fermented wine in bottle." (*Id.,* § 1, p. 47.) The statute prevented the use or introduction of impure "substitutes for grapes" or coloring, or foreign fruit juices "not the pure product of grapes," and further barred the use of preservatives such as "salicylic acid, glycerin, alum, or other chemical antiseptics." (*Id.,* § 2, p. 47.) The statute also provided for inspection of wine samples and for the use of bottleneck seals and label certificates (*id.,* § 7, pp. 48–49), and required either the statement " 'Pure California wine' " (together with the maker's name) or the label certificate to be affixed to each bottle of pure wine. (*Id.,* § 8, p. 49.)[20] This court's decision in *Ex parte Kohler, supra,* 74 Cal. 38, rejected constitutional challenges to the act and concluded that, like legislation designed to ensure the marketing of

---

[16] As of 1890, those three states produced approximately 60, 10, and 8 percent, respectively, of the wine produced in the United States. (U.S. Dept. of Interior, Census Off., Rep. of Statistics of Agriculture in the U.S. at the 11th Census: 1890 (1895) p. 602.)

[17] See Pinney, A History of Wine in America (1989) pages 404–405, 420–422 (describing early winemaking in Arkansas and Oregon).

[18] As observed *ante,* footnote 16, by 1890 California produced most of the wine grown and made in the United States. Today, according to the Wine Institute, California produces more than 90 percent of the nation's wine. (See <http://www.wineinstitute.org/communications/statistics/wine_production_key_facts.htm> [as of Aug. 5, 2004].)

[19] See generally, California Wine Industry, *supra,* at pages 26 ("the French viticultural journal, *Revue Viticole,* in 1862, credited California with being the only wine-producing area of North America capable of competing with the product from Europe") and 133 (noting that 35 medals were awarded to California wines at the Paris Exposition Universelle in 1889).

[20] In addition—and belying Bronco's claims that this and similar statutes lacked detail—the statute contained various other provisions dealing comprehensively with the production and labeling of wine. (See Stats. 1887, ch. 36, §§ 3–6, pp. 47–49.)

pure milk and safe meats, the statute was a proper exercise of the state's police powers. (*Id.*, at pp. 41–42.)[21]

Colorado quickly followed in April 1887 with its own statute regulating the "manufacture or sale" of wine and other alcoholic beverages.[22] New York adopted its own wine labeling statute in June 1887.[23] Two years later Ohio adopted a law that expanded upon the three wine labeling statutes described above.[24] Arkansas adopted a wine labeling statute in 1897,[25] and in 1905 Oregon adopted its own wine labeling statute.[26]

---

[21] The *Ex parte Kohler* decision proceeded to construe the act's labeling requirements as prohibiting the sale of wines not meeting the definition of pure wines under the act, but as not subjecting to penalty a merchant who sells wine that is pure but lacks the required labels. (*Ex parte Kohler, supra*, 74 Cal. at pp. 44–45.)

[22] (1887 Colo. Sess. Laws, § 2, p. 18 et seq.) The legislation required that wine be "pure"—defined as made from "the juice of the grape"—and specified that "[n]o vinous . . . liquors shall be offered or exposed for sale in this State, unless the . . . package, containing such liquors, shall be 'plainly" marked with "the word 'pure' wine," and displaying "the name or brand of the particular kind of wine so offered or exposed." (*Id.*, §§ 3 & 4, pp. 18–19.)

[23] (1887 N.Y. Laws, ch. 603, p. 814 et seq.) The New York law was designed to address its specific regional needs as reflected in the industry practices of New York winemakers who, like those in Europe and other areas of the United States but unlike those in California, often found it necessary to add sugar in the production of their wines. The law defined and made illegal adulterated wine, and thereafter defined and required the proper labeling of "pure wine," "half wine," and "made wine." (*Id.*, §§ 1–4, pp. 814–816.)

As Bronco observes, the New York provision, as codified in 1889 (N.Y. Pub. Health Law, ch. 25, art. III, §§ 46–49 (Birdseye 1889)), referred, in its definition of adulterated wines, to those "offered for sale or manufactured with intent to sell within this state." (*Id.*, § 46.) Bronco asserts this and similar phrasing in the statute's penalty provision (*id.*, § 49) suggests the New York statute was intended to apply only to wines sold within the state. There is no evidence that the similar California law mentioned above, or the Ohio law mentioned below, was so confined or intended. But in any event, the relevant point is that New York—like the other states—exercised its traditional police powers by specifically regulating the labeling of wines.

[24] (1889 Ohio Laws, p. 96 et seq.; 1891 Ohio Laws, p. 231.) As amended in 1891, the Ohio law defined three versions of permitted wine: "pure wine," "wine," and "compound wine," and specifically allowed sugar to be added to the latter two products. The statute provided that each type of wine "shall be . . . labeled, designated and sold" as such and made it illegal to label or package, in a manner "calculated to mislead or deceive any person, or cause to be supposed that the contents thereof be pure wine," any product not meeting the definition of pure wine. (1891 Ohio Laws, §§ 2–4, pp. 231–233.)

[25] (1897 Ark. Acts, act 42, § 4, p. 108.) As subsequently amended (1899 Ark. Acts, act 80, pp. 137–138) and codified (Stats. of Ark., ch. 103, § 5101 (Kirby 1904)), the statute provided: "All wine sold in this State shall, before sale, be labeled so as to truly designate its kind and quality. Nothing but the pure fermented juice of the grape shall be labeled 'Natural Wine.' Wine to which sugar has been added before fermentation shall be labeled 'Sugared Wine.' The label shall also state if the wine be sweetened or unsweetened."

[26] (1905 Or. Laws, ch. 209, p. 347 et seq.) The Oregon law defined and barred "adulterated wine," allowed certain amounts of sugar to be used in the production of "pure wine," and defined and permitted "half wine" and "made wine," so long as those products were labeled as such. (*Id.*, §§ 54–56, pp. 361–362.)

### c. *Relevant federal law in the early 20th century: A failed wine statute; adoption of the Pure Food and Drugs Act of 1906; administrative "food standards"; and "Food Inspection Decisions"*

Far from supplanting these early efforts by the states, Congress in 1906 at first attempted but failed to enact a federal wine labeling statute similar to those adopted by the states.[27] As explained below, later in the same session Congress did enact a general pure food and beverage statute, but the resulting federal scheme produced no enforceable wine labeling regulation.

Congress's 1906 federal Pure Food and Drugs Act (Pub.L. No. 59-384 (June 30, 1906) 34 Stat. 768 (hereafter sometimes the 1906 Act)) borrowed substantially from the preceding state food and beverage legislation. Like the earlier New York statute described above (*ante*, pt. II.B.1.a.), the federal act defined as "misbranded"—and illegal—any food or beverage "package . . . or label" that bore "any statement, design, or device regarding . . . the ingredients or the substances contained therein, which [is] false or misleading in any particular, and [] any food or drug product which is falsely branded as to the State, Territory, or country in which it is manufactured or produced." (Pub.L. No. 59-384, § 8 (June 30, 1906) 34 Stat. 770.)

Also like the previous general pure food and beverage laws of the states, the 1906 federal Act applied to food and "drink" (Pub.L. No. 59-384, § 6 (June 30, 1906) 34 Stat. 769), which in turn was construed to include wine. (See *United States v. Sweet Valley Wine Co.* (N.D. Ohio 1913) 208 F. 85, 87 (*Sweet Valley*).) The 1906 Act directed three department secretaries—the Secretary of the Treasury, the Secretary of Agriculture, and the Secretary of Commerce and Labor—jointly to adopt regulations "for carrying out the provisions of this Act." (Pub.L. No. 59-384, § 3 (June 30, 1906) 34 Stat. 768–769.)

As commanded by Congress, in October 1906 the three department secretaries jointly adopted a set of regulations under the 1906 Act. (See U.S.

---

[27] See Hearing before the House Committee on Ways and Means, on House Resolution No. 12868, 59th Congress, 1st Session, pages 1–60 (Feb. 1, 1906) (February hearings); Second Hearing before the House Committee on Ways and Means, 59th Congress, 1st Session, pages 61–114 (Apr. 6 & 10, 1906) (April hearings). The proposed legislation would have defined wine as "pure," "carbonated," or "artificial," and required labeling as such. (Feb. hearings, *supra*, at pp. 5–7.) During a second committee hearing concerning the bill and a revised version of the bill, the committee made clear that in considering the proposed federal legislation it had consulted the related wine laws of France, Italy, Germany, Ohio, New York, "and other states." (Apr. hearings, *supra*, at pp. 62, 73, 101, 109–112.)

A recurring theme during the hearings was the harm posed to the wine industry by the sale of "sophisticated and fabricated wines." The proponents' stated concern was that if the sale of such products were "allowed or countenanced . . . in time honest wine will be driven from the market, . . . to the injury of the vineyardists . . . ." (Apr. hearings, *supra*, at p. 66; see also *id.*, at pp. 73–74, 102.) That wine labeling legislation, however, died in committee.

Dept. of Agriculture, Circular No. 21, reprinted as amended through 1909 in Thornton, The Law of Pure Food and Drugs, National and State (1912) pp. 843–860 (Law of Pure Food and Drugs); see generally Hayes & Ruff, *The Administration of the Federal Food and Drugs Act* (1933) 1 Law & Contemp. Probs. 16, 20 (*Administration of the Federal Food and Drugs Act*).) One provision of those regulations governed the labeling of foods and beverages and prohibited, among other things, false or misleading statements concerning a product's "place [of] origin." (Circular No. 21, *supra*, Reg. 17(d), reprinted in Law of Pure Food and Drugs, *supra*, at p. 851.)

Implicitly acknowledging, as it must, that "[p]rior to the repeal of Prohibition, no agency of the Federal Government was provided with statutory authority to regulate the labeling . . . of alcoholic beverages specifically" (Russell, *Controls Over Labeling and Advertising of Alcoholic Beverages* (1940) 7 Law & Contemp. Probs. 645, 645 (*Controls Over Labeling*)), Bronco's supplemental brief points to (i) separate "food standards" (including wine standards) adopted solely by the Secretary of Agriculture in the two years prior to enactment of the 1906 federal Pure Food and Drugs Act, and (ii) two "Food Inspection Decisions" (hereafter sometimes F.I.D.), one issued solely by the Secretary of Agriculture and the other issued jointly by the three secretaries. (See Standards of Purity for Food Products (June 26, 1906) Circular No. 19, reprinted in Westervelt, American Pure Food and Drug Laws (1912) pp. 61, 78–79 (American Pure Food and Drug Laws); F.I.D. No. 109 (Aug. 21, 1909); & F.I.D. No. 120 (May 13, 1910), both reprinted in American Pure Food and Drug Laws, *supra*, at pp. 212–214.) As explained below, under federal law the cited food standards (including the wine standards) were merely advisory, and not legally binding, and with respect to the cited Food Inspection Decisions, the first was nonbinding and the second, even if binding, did not demonstrate federal control over the labeling of wines.

The cited food standards had been created at the behest of Congress, which in 1902 and 1903 directed the Secretary of Agriculture to undertake numerous projects, including one "to establish standards for purity of food products and determine what are regarded as adulterations therein, *for the guidance of the officials of the various States* and of the courts of justice . . . ." (Pub.L. No. 57-1008 (Mar. 3, 1903) 32 Stat. 1147, 1158, italics added; see also Pub.L. No. 57-139 (June 3, 1902) 32 Stat. 286, 296.) The resulting detailed food standards addressed more than 200 categories of food items, including salted meats, oatmeal, lemon and vanilla extracts, olive oil, coffee, and—in part II.F.a.3 of the secretary's food standards—what Bronco characterizes as "detailed and comprehensive" standards for wine, dry wine, fortified dry wine, sweet wine, fortified sweet wine, sparkling wine, modified wine (a

low-alcohol product made by the addition of sugar), and raisin wine (a product made from pomace—dried, evaporated, or previously crushed grapes).

Contrary to Bronco's suggestions and representations, the Secretary of Agriculture's food standards (and hence the wine standards contained therein) were not enforceable under the 1906 federal Pure Food and Drugs Act (which, as noted, required that enforcing regulations be adopted by *all three* named secretaries), or indeed under *federal* law at all. (See *United States v. St. Louis Coffee & Spice Mills* (E.D.Mo. 1909) 189 F. 191 [finding the food standards relating to vanilla extract unenforceable under the 1906 Act].) In view of the 1906 Act's "three secretaries" requirements for regulations and the resulting case law, the food standards proclaimed by the Secretary of Agriculture acting alone have been described by authoritative commentators as merely "advisory" and as being "for the guidance of officials and the trade but *not having the force and effect of [federal] law.*" (Salthe, *State Food, Drug and Cosmetic Legislation and its Administration* (1939) 6 Law & Contemp. Probs. 165, 167, italics added; see also Lee, *Legislative and Interpretative Regulations* (1940) 29 Geo. L.J. 1, 4–17 (*Interpretative Regulations*) [noting that despite many congressional attempts in the course of three decades to make the food standards enforceable, manufacturers " 'could take 'em or leave 'em' without legal consequences" under *federal* law]; *Alcoholic Beverage Control Before Repeal, supra,* 7 Law & Contemp. Probs. 544, 553; cf. *Administration of the Federal Food and Drugs Act, supra,* 1 Law & Contemp. Probs. 16, 32, fn. 71.) Indeed, even the treatise upon which Bronco relies concurred on this point, characterizing those same food standards as "not controlling" under federal law. (American Pure Food and Drug Laws, *supra,* at p. 60.) In view of this history, we must reject Bronco's suggestion that the cited food standards, and the wine standards contained therein, constituted enforceable federal regulations under the 1906 Act or were otherwise enforceable as a matter of federal law.

We reach similar conclusions with respect to the two Food Inspection Decisions cited by Bronco, issued in 1909 and 1910, respectively. The first Food Inspection Decision, approved by the Secretary of Agriculture acting alone, stated that Missouri and Ohio wines, which typically were produced by adding substantial amounts of sugar, "would properly be called a 'sugar wine' "—and that when made by the mixture of pomace, sugar, water, colorings and preservatives, such products should be called " 'imitation wine.' " (F.I.D. No. 109, reprinted in American Pure Food and Drug Laws, *supra,* at p. 212.) The second cited Food Inspection Decision, issued under the signatures of the three department secretaries, essentially retreated from and modified the first and stated that in light of (and apparently in deference to) the fairly lax Ohio wine statute (see *ante,* fn. 24), which had long permitted the use of sugar in wine production, such "sugared" wines properly

could be called " 'Ohio Wine,' or 'Missouri Wine,' respectively, without further qualification." (F.I.D. No. 120, reprinted in American Pure Food and Drug Laws, *supra*, at p. 213.) Moreover, the decision stated, Ohio and Missouri imitation wines could be labeled as " 'Ohio Pomace Wine,' or 'Missouri Pomace Wine.' " (*Id.*, at p. 214.)

These decisions reveal that the federal agency, far from exercising federal authority to control state practices by requiring adherence to the "detailed and comprehensive" wine provisions of the food standards cited by Bronco, instead completely ignored those federal standards and, in the second decision, actually *deferred* to the applicable state wine statute, which in turn codified long-standing and lenient regional winemaking practices.

In any event, contrary to Bronco's suggestion that these Food Inspection Decisions evinced federal control, the first cited decision, No. 109 (approved by the Secretary of Agriculture acting alone), did not constitute a regulation under the 1906 Act and was merely advisory.[28] Because the second cited Food Inspection Decision, No. 120, was signed by all three secretaries it arguably qualified as an enforceable federal regulation under the 1906 Pure Food and Drugs Act. (See American Pure Food and Drug Laws, *supra*, at p. 17.) As noted above, however, in substance this assumed regulation merely acquiesced in and adopted fairly lax state (Ohio) law. It does not, therefore, support Bronco's implicit argument that federal regulatory authorities during this period exercised power to control wine labels in a manner different from that of the states.

For these reasons we reject Bronco's suggestion that the Secretary of Agriculture's food standards, including the detailed and comprehensive wine standards, constituted enforceable federal law, that Food Inspection Decision No. 109 constituted an enforceable federal wine labeling regulation, or that Food Inspection Decision No. 120 evinced anything more than federal acquiescence in state law. Based upon the material cited to us, we conclude that whatever federal regulation of wine labeling existed between the first decade of the 20th century and the advent

---

[28] The very limited effect of such decisions was described by the issuing entity itself as follows: "*The opinions or decisions of this Department . . . are . . .* issued more in an advisory than in a mandatory spirit. It is clear that if the manufacturers, jobbers, and dealers interpret the rules and regulations in the same manner *as they are interpreted by this Department*, and follow that interpretation in their business transactions, no prosecution will lie against them. . . . [¶] It may often occur that the opinion of this Department is not that of the manufacturer, jobber, or dealer. In this case there is no obligation resting upon the manufacturer, jobber, or dealer to follow the line of procedure marked out or indicated by the opinion of this Department. Each one is entitled to his own opinion and interpretation and to assume the responsibility of acting in harmony therewith. . . ." (F.I.D. No. 44 (Dec. 1, 1906), reprinted in Gwinn, U.S. Dept. of Agriculture, Food and Drugs Act (1914) pp. 35–36, italics added; see also American Pure Food and Drug Laws, *supra*, at pp. 16–18; *Administration of the Federal Food and Drugs Act, supra,* 1 Law & Contemp. Probs. at pp. 20–21.)

of Prohibition was achieved only indirectly, on a case-by-case basis, through prosecutions under the general misbranding provisions of the 1906 federal Pure Food and Drugs Act.[29] *That* relatively limited federal activity, however, neither erased nor eclipsed the previous quarter-century of state regulation described above. (*Ante,* pt. II.B.1.a. & b.)

Moreover, at the same time federal activity in this area was commencing, state activity was continuing and at least keeping pace. By 1906, nearly all of the states had exercised their traditional police powers to enact pure food and beverage laws, almost all of which covered drinks, including wine.[30] Even more importantly, as explained below, within a few years of 1906 the Secretary of Agriculture's food standards (including the detailed and comprehensive wine standards)—although remaining merely advisory and unenforceable under *federal* law—specifically were adopted as part of the general food laws of most states (including California). The perhaps ironic result was that the Secretary of Agriculture's wine standards were to become enforceable substantive law in most states under *state* law, even while they remained unenforceable as a matter of federal law.

 d. *Relevant state law in the early 20th century: Adoption of California's place—name wine statute; California's Pure Foods Act and adoption of the food standards, including the wine standards; and corresponding labeling regulations*

Nothing in the 1906 federal Pure Food and Drugs Act implied that the existing and continuing state regulation of the misbranding of food and beverages was preempted by that federal legislation. Indeed, the act "disclose[d] very clearly that it [was] not intended to trench upon the powers of the states in any respect." (*Cleveland Macaroni Co. v. State Board of Health* (N.D.Cal. 1919) 256 F. 376, 379; see also *Savage, supra,* 225 U.S. 501 [upholding, against a claim of preemption, Indiana food and drug labeling

---

[29] In addition to the federal prosecution under the 1906 Act that resulted in the decision in *Sweet Valley, supra,* 208 F. 85, in which the federal district court held that the challenged "pomace wine" product in that case, labeled as German "Select Riesling" and "Hochheimer," was misbranded under both the 1906 Act and the Ohio wine statute—we are aware of one similar wine mislabeling prosecution under the 1906 Act (*Sixty Barrels of Wine* (D.C.Mo. 1915) 225 F. 846) and three similar federal prosecutions concerning bottled "Champagne." (*Duffy-Mott Co. v. United States* (3d. Cir. 1923) 285 F. 737; *Schraubstadter v. United States* (9th Cir. 1912) 199 F. 568; *United States v. Five Cases of Champagne* (N.D.N.Y. 1913) 205 F. 817.) One might ask why the *Duffy-Mott* case arose during Prohibition. The answer is that even during Prohibition, *pharmacists* were permitted to sell "prescription Champagne." (Byszewski, *What's in the Wine? A History of the FDA's Role* (2002) 57 Food & Drug J. 544, 554.)

[30] See Hearings before the House Committee on Interstate and Foreign Commerce on the Pure-Food Bills, 59th Congress, 1st Session (Feb. 13, 1906) page 308. Indeed, according to contemporaneous assessments, those states with adequate enforcement mechanisms (approximately 20 states) were, by 1906, applying their laws "very rigidly." (*Ibid.*)

regulations]; see generally Fisher, *The Proposed Food and Drugs Act: A Legal Critique* (1933) 1 Law & Contemp. Probs. 74, 75 & fn. 4 (*Proposed Food and Drugs Act*) [noting case law holding that states were permitted to prescribe "additional standards" and that "[c]ompliance with federal standards does not secure the right to interstate transportation free from 'reasonable' regulation by the state"].)

Soon after passage of the 1906 federal act, the California Legislature, in an apparent effort to combat the continuing problem of the labeling of California wines as foreign wines, adopted a statute requiring a "uniform wine nomenclature" that, for the first time, specifically regulated the use of place names on wine labels. The statute provided for "pure" California wines to be labeled with the "prefix 'Cal' or 'Cala' . . . as for example, 'Calclaret,' 'Calburgundy,' 'Calariesling,' etc., . . ." (Stats. 1907, ch. 104, § 1, pp. 127–128.) The statute further prohibited the use of any such label on wines other than pure California wines. It barred "labeling any vessel, bottle, . . . or package containing any liquid other than pure wine of California manufacture, . . . or any paper or brand in similitude or resemblance thereof, or any paper or brand of such form and appearance as to be calculated to mislead or deceive any unwary person or cause him to suppose the contents thereof to be pure wine of California manufacture, origin or production . . . ." (*Id.*, § 2, p. 128.)

Following passage of the 1906 federal Pure Food and Drugs Act, states left in place or expanded (or in other instances enacted for the first time) their own statutes to address the problems of adulteration, misbranding, and mislabeling of food and beverages. (See generally American Pure Food and Drug Laws, *supra*, at pp. 260–1450; *Proposed Food and Drugs Act, supra,* 1 Law & Contemp. Probs. 74, 75 & fn. 4.) California, for its part, adopted such a general scheme in March 1907, addressing the problem of "adulterated, mislabeled or misbranded food, or liquor." (Stats. 1907, ch. 181, § 1, p. 208; 1907 Pure Foods Act or 1907 State Act.) That statute—like those of many other states—specifically adopted under *state* law the food standards (including the wine standards) that had been formulated by the Secretary of the United States Department of Agriculture, but which, as described above, were unenforceable under *federal* law. (Stats. 1907, ch. 181, § 3, p. 209.) Further going beyond anything set forth in the federal law, the state statute also made it illegal to, among other things, "*falsely brand*[]" any food or liquor concerning the "*county, . . . city, town,* [*or*] *state . . . in which it is manufactured, or produced*" (*id.*, § 5, p. 210, italics added),[31] and provided that "[f]ood and liquor shall be deemed *mislabeled or misbranded* within the

---

[31] In this respect, the author of the 1912 treatise relied upon by Bronco observed that "the prohibitions in the California statute . . . against misstatements as to geographical source" were "more detailed" than those under federal law. (American Pure Food and Drug Laws, *supra*, at p. 339.)

meaning of this act . . . [¶] . . . [¶] [i]f the package containing it or its label shall bear any statement, design or device regarding the ingredients or the substance contained therein, which statement, design, or device shall be false or misleading in any particular." (Stats. 1907, ch. 181, § 6, p. 210, italics added.)[32]

Accordingly, as of March 1907 and continuing through the next three decades, California (like many other states)[33] had adopted specific and enforceable wine standards that exceeded federal law. During this same period—and indeed, until repeal of the 1906 federal Pure Food and Drugs Act in 1938—the Secretary of Agriculture's food standards remained unenforceable under federal law despite periodic attempts to provide otherwise. (See *Interpretative Regulations, supra,* 29 Geo. L.J. 1, 6–17.)[34]

### e. *California's post-Prohibition-repeal wine labeling regulations*

With the advent of Prohibition, which became effective on January 29, 1920 (U.S. Const., 18th Amend.), the California wine industry fell into a dormant phase, awakening upon repeal of Prohibition in December 1933 through adoption of the Twenty-first Amendment to the federal Constitution.

---

[32] In early 1908, California's Department of Public Health adopted comprehensive regulations implementing the 1907 state Act, broadly regulating "for domestic commerce" the labeling of foods and beverages and specifically providing that "[*t*]*he label shall be free from any statement, design, or device regarding . . . place of origin, which is false or misleading in any particular.*" (Cal. Dept. of Pub. Health, Rules and Regs. for Enforcement of Cal. Pure Foods and Drugs Acts (1909) reg. No. 16, p. 22, italics added.) Those regulations, as periodically amended, continued in force through at least 1935. (Cal. Dept. of Pub. Health, Rules and Regs. for Enforcement of Cal. Pure Foods and Drugs Acts (1928) reg. No. 13(d) & (e), p. 20 [providing as quoted above, and further providing that food or beverages shall not be "labeled or branded in such a manner as to deceive or mislead the consumer"]; Cal. Dept. of Pub. Health, Rules and Regs. for Enforcement of Cal. Pure Foods and Drugs Acts (1933) reg. No. 13(d) & (e), p. 18 [same].)

[33] See American Pure Food and Drug Laws, *supra,* listing, as of 1912, the following additional states that had adopted the Secretary of Agriculture's food (and wine) standards, or essentially identical standards: Alabama (at p. 270); Delaware (at p. 418); Florida (at p. 438); Georgia (at pp. 468–474); Idaho (at p. 499); Illinois (at pp. 524–525); Indiana (at p. 551); Kansas (at pp. 604–605); Kentucky (at pp. 634–635); Louisiana (at pp. 661–662); Maine (at pp. 680–681); Maryland (at pp. 705–706); Mississippi (at pp. 828–829); Missouri (at p. 851); Montana (at p. 880); Nevada (at p. 932); New Hampshire (at p. 952); New Jersey (at p. 980); North Carolina (at p. 1051); Oklahoma (at p. 1128); Rhode Island (at pp. 1207–1208); South Dakota (at p. 1241); Texas (at p. 1285); Utah (at p. 1306); Virginia (at pp. 1350–1351); Wisconsin (at pp. 1416–1417); and Wyoming (at p. 1441). (See also *Interpretative Regulations, supra,* 29 Geo. L.J. at p. 13 & fn. 27.)

[34] Effective through at least 1935, the state's 1907 Pure Foods Act continued to adopt—as *minimum* standards—the federal food standards (including the wine standards). (Stats. 1933, ch. 758, § 10, pp. 2001–2002.)

At least two years prior to adoption of the FAA Act in August 1935—and indeed before, and in anticipation of, the repeal of Prohibition—the California Legislature, exercising both its traditional police powers and its authority under newly enacted article XX, section 22 of the state Constitution,[35] adopted as an interim measure the State Liquor Control Act (Stats. 1933, ch. 178, p. 625; *id.*, ch. 658, p. 1697) and thereafter adopted the California Alcoholic Beverage Control Act (ABC Act), which went into effect on June 13, 1935. (Stats. 1935, ch. 330, p. 1123; see Bus. & Prof. Code, § 23000 et seq.)[36]

Meanwhile, in late December 1934—*before* adoption of *any* federal regulation applicable to wine labels—California, acting through its Department of Public Health, Bureau of Food and Drug Inspections, and pursuant to its own 1907 Pure Foods Act (Stats. 1907, ch. 181, §§ 5 & 6, p. 210), adopted regulations concerning "Definitions and Standards—Wines." (Cal. Dept. of Pub. Health, Bur. of Food and Drug Inspection, Regs. adopted Dec. 31, 1934, amended April 13, 1935, as printed Jan. 18, 1936 (1934 Regulations).) A preamble set forth in broad terms the purpose and scope of the regulations. The stated goal was to protect both "the consuming public" and "the wine industry as a whole." (*Id.*, at p. 1.)[37] To this end, the regulations adopted specific chemical definitions for dry red wines, dry white wines, and sweet wines (*id.*, at pp. 1–2), similar in substance to the standards incorporated into the state's 1907 Pure Foods Act, and which, as explained *ante*, part II.B.1.d, had by then been in place in California (and numerous other states) for nearly 30 years. The 1934 Regulations also established strict and detailed labeling requirements for sparkling and artificially carbonated wines

---

[35] In 1932, anticipating ratification of the repeal of Prohibition, California voters passed a constitutional amendment, providing as follows: "The State of California, subject to the internal revenue laws of the United States, shall have the exclusive right and power to license and regulate *the manufacture*, sale, purchase, possession and transportation of alcoholic beverages within the State, and subject to the laws of the United States regulating commerce between foreign nations and among the states shall have the exclusive right and power to regulate the importation into and *exportation from the State*, of alcoholic beverages. . . ." (Cal. Const., art XX, § 22, italics added.)

[36] At that same time, the Legislature repealed the 1907 "Cala" wine labeling statute. (See Stats. 1935, ch. 330, § 69, p. 1152; Caddow, *Permanent Wine Labeling Regulations* in Wines & Vines (Feb. 1936) 10.) The 1887 state "pure wine" labeling statute (Stats. 1887, ch. 36, p. 46) previously had been repealed in 1911. (Stats. 1911, ch. 587, § 1, p. 1110.) Of course, despite these repeals, the state's 1907 Pure Foods Act (Stats. 1907, ch. 181, p. 208 et seq.), which as noted above incorporated specific wine standards, and the regulations adopted under the 1907 Act (all described *ante*, pt. II.B.1.d.), remained in effect and prohibited the mislabeling of wine.

[37] Contrary to assertions in Bronco's supplemental briefs, there is no indication that the scope of the 1934 regulations was limited to wine sold to consumers in California and that the regulations did not address wines destined for interstate commerce.

(Regs., at p. 2)[38] and for still wines (*id.*, at pp. 2–3). In the latter respect, the regulations addressed the decades-old problem of California wines being labeled with foreign place names such as "Burgundy." The state regulations allowed the unqualified use of that name and similar French place names "only [for] products from France," and provided that a wine would be "regarded as *misbranded*" (and hence in violation of the state's 1907 Act and ensuing regulations described *ante*, pt. II.B.1.d.) if the label read "Burgundy" (or any other foreign place name) and the wine was not produced there, unless the label also "displayed with prominence equal to that" of the foreign place name, "the name of the state or country where the wine is produced." (1934 Regs., at p. 2, italics added.)[39]

Bronco insists that these various state regulations, viewed as a whole, "did not represent any innovation by California" and that "similar, albeit more detailed and comprehensive . . . standards already had been adopted nearly thirty years before by federal regulators." As explained *ante*, part II.B.1.c, however, the historic record does not support Bronco's claim. The standards to which Bronco refers never were enforceable under federal law, but in fact, by 1907, they had become part of the substantive (and enforceable) law of California—and within a short time, of most other states as well. In other words, the touted innovation (enforceable wine labeling standards) was accomplished by California and other states, and not by the federal government.

 f. *Initial (and short-lived) federal wine labeling regulations issued by the Federal Alcohol Control Administration*

As Bronco emphasizes, a few months after adoption of the 1934 California wine labeling regulations, federal wine labeling regulations (which, as explained below, proved to be short-lived and never became effective) were for the first time adopted in late March 1935 by the recently created Federal Alcohol Control Administration (FAC Administration), which had been established by executive order under the National Industrial Recovery Act (15 U.S.C. § 703). (See Harrison & Lane, After Repeal (1936) p. 24 (After Repeal).) The FAC Administration's regulations, like the numerous similar

---

[38] The regulation provided: "*Champagne* is a light white sparkling wine identical with champagne as made in the Champagne district in France in respect to composition and basic manufacturing principle. If the secondary fermentation is not within the bottle, there shall be stated in direct conjunction with the word 'Champagne' the words 'Secondary Fermentation in Bulk.' " (1934 Regs., at p. 2.) The regulations also provided specific labeling requirements for artificially carbonated wines: "The word 'carbonated' should be in the same color [and] style of type on the same colored background as the wine described." (*Ibid.*)

[39] The regulations also restricted the use, on wine labels, of statements of age and the word "old" (1934 Regs., at pp. 2–3), and further required that any product made from pomace be labeled "IMITATION WINE/ Made of Wine Pomace, Water and Sugar" (*id.*, at p. 2).

state food and beverage regulations that preceded them, were directed against, among other things, "misbranding"—the false or misleading labeling of alcoholic beverages. (See FAC Admin., Misbranding Regs., Series 7, Regs. Relating to the Labeling of Wine (Mar. 25, 1935) § 3(b)(3) (Misbranding Regulations) [a wine bottle is misbranded if its label "tends to create a misleading impression of the wine"]; see generally O'Neill, *Federal Activity in Alcoholic Beverage Control* (1940) 7 Law & Contemp. Probs. 570, 572; After Repeal, *supra*, at pp. 27–29.) Nowhere in these nascent federal regulations was there any suggestion that they preempted stricter state regulations. In any event, within two months of their adoption and prior to their effective date (see Misbranding Regs., *supra*, § 1(a)(3)), the federal regulations became unenforceable in late May 1935 after the United States Supreme Court invalidated as unconstitutional similar "fair competition" codes adopted under the National Industrial Recovery Act. (*Schechter Corp. v. United States* (1935) 295 U.S. 495, 541–542 [79 L.Ed. 1570, 55 S.Ct. 837].)

### g. *Continuing regulation by other states*

Despite the initial failure of federal regulation of wine labels, regulation by the states continued in and through 1935. In addition to California's then long-established general food and beverage regulations, and its then recent specific wine regulations, described *ante*, part II.B.1.d–e, the Ohio and Oregon wine labeling statutes, described above (*ante*, fns. 24 & 26), still were in effect[40] and most other states had food and beverage statutes, the majority of which regulated mislabeling or misbranding of beverages, including wine. As already explained, many of those statutes adopted specific and comprehensive wine standards that were enforceable only under state, and not federal, law—and as of 1935, many had been revised specifically to bar misrepresentations on labels concerning the place of manufacture or production.[41]

---

[40] The original Ohio wine law (1889 Ohio Laws, p. 96 et seq.) was, by 1938, codified in Page's Ohio Revised Code Annotated (Anderson 1938) title II, chapter 1, sections 5795–5805. Oregon's 1905 wine labeling statute (1905 Or. Laws, ch. 209, §§ 54–56, pp. 361–362) was reenacted a decade later (1915 Or. Laws, ch. 343, §§ 41–43, pp. 570–571) and apparently still was effective through mid-1937, when Oregon adopted post-Prohibition-repeal wine labeling regulations. (See also Or. Liquor Control Admin. (1937) reg. 5(c) [specifically enforcing the California wine regulations discussed above] & 6 [setting forth labeling requirements].)

[41] For example, the food and beverage labeling statutes of Massachusetts, North Dakota, and Washington, described *ante*, part II.B.1.a, each remained in force in 1935, as revised, and each defined as "misbranded" any food or drink label bearing "any statement, design or device" that was "false or misleading in any particular," or any item "falsely branded as to the state or country where it was manufactured or produced," or very similar words to that effect. (See 1932 Mass. Gen. Laws, ch. 94, §§ 186, 187; 1923 N.D. Laws, ch. 222, §§ 4, 6, pp. 289–291; Rev. Stats. of Wash. (Remington 1932) tit. 40, §§ 6145, 6147; see also Rev. Stats. of Wash.,

### 2. *Propriety of imposing a presumption against preemption in this case*

█ In light of the history set forth above, we disagree with Bronco's assertion, advanced in its original brief in this court, that federal regulation of wine labeling prior to Congress's adoption of the FAA Act in August 1935 was "well established," and that "[b]y contrast, the states' regulation of wine labeling . . . ranged from limited to none." Nor do we agree with the accusation of amici curiae Abundance Vineyards et al. that the Department and the NVVA have "suggested, *misleadingly*, that the States, and not the Federal government, historically played the dominant role in the regulation of the alcoholic beverage industry before enactment of the FAA Act." (Italics added.) Based upon our review of the relevant history, we conclude that from the mid to late 19th century until shortly after the repeal of Prohibition, the states' exercise of their traditional police power to regulate the labeling of food—including wine and other alcoholic beverages—was both extensive and dominant. This historic evidence demonstrates that when, as described below, Congress finally entered the specific field of wine label regulation in August 1935 by enacting the FAA Act, under which the federal regulation here at issue was promulgated, Congress was legislating in a field "traditionally regulated by the States." (*ARC America Corp., supra,* 490 U.S. 93, 101, and cases cited.)[42] Accordingly, a strong presumption against preemption applies, and a court should not find that the traditional police powers of the states to regulate wine labels (in order to prevent the deception of consumers) are superseded unless it is clear and manifest that Congress intended to preempt state law.

---

*supra,* § 6137 [adopting the federal food standards, including wine standards, as minimum standards].)

In New York, Colorado, and Arkansas, the previous wine-specific labeling statutes described *ante,* part II.B.1.b, had given way, by 1935, to the states' respective general food and beverage mislabeling/misbranding regulations, all of which regulated both food and drink. (See N.Y. Agric. & Mkts. Law, ch. 1, art. 17, § 200 (Cahill 1930); Ann. Stats. of Colo., ch. 1, § 6 (Courtright 1930); Stats. of Ark., ch. 69, § 4823 (1919).) There is no indication, with respect to any of these changes in the various states' laws, that any diminution of state regulatory authority over the labeling of wines thereby was intended or effected.

[42] For the reasons set forth above, we also reject Bronco's related assertion, pressed in its supplemental briefs and at oral argument, that no presumption against preemption applies here because, Bronco claims, the states' regulatory activity was augmented in the early 20th century by a "significant federal presence." (See *Locke, supra,* 529 U.S. 89, 108 [finding no presumption against preemption regarding regulation of maritime vessels].) As explained *ante,* part II.B.1, prior to adoption of the FAA Act in 1935, the federal role with respect to wine label regulation was neither dominant nor particularly significant in comparison with that of the states—and in any event, unlike the situation in *Locke,* federal activity in the field of wine label regulation certainly was not "manifest since the beginning of our Republic." (*Locke, supra,* at p. 99.)

We turn now to consider whether, as Bronco claims, there was, at the time of the enactment of the FAA Act or thereafter, a clear and manifest intent on the part of Congress to preempt wine labeling regulation by the states such as is found in section 25241. We find no such intent. We thereafter consider whether, as Bronco claims, section 25241 is *impliedly* preempted by federal law because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines, supra,* 312 U.S. 52, 67.) As we explain, we find no such implied preemption.

## C.

### 1. *Whether Congress, when it enacted the FAA Act in 1935, intended to preempt state wine labeling regulation*

■ As explained below, contrary to Bronco's assertions the history of the 1935 FAA Act discloses no intent on the part of Congress to supplant or preempt state efforts to regulate wine labeling.

In late August 1935, Congress replaced the defunct FAC Administration with the Federal Alcohol Administration Act. (Pub.L. No. 74-401 (Aug. 29, 1935) 49 Stat. 977, presently 27 U.S.C. § 201 et seq.) The essential aspects of the FAA Act exist today in substantially unamended form and remain the basis for federal regulation of wine labeling. (See Benson, *Regulation of American Wine Labeling: In Vino Veritas?* (1978) 11 U.C. Davis L.Rev. 115, 154 et seq. (*Regulation of American Wine Labeling*).)

■ Substantively, the FAA Act in large measure emulated the main aspects of the invalidated FAC Administration. (After Repeal, *supra,* at p. 32; *Regulation of American Wine Labeling, supra,* 11 U.C. Davis L.Rev. 115, 165.) The FAA Act makes it illegal for any person to produce, sell, or ship wine in interstate or foreign commerce unless that person is licensed to do so by the Secretary of the Treasury.[43] (27 U.S.C. § 203(a) & (b).) Title 27 United States Code section 205(e)—the primary federal statutory provision

---

[43] As originally enacted, the statute referred to the "Administrator" of the "Federal Alcohol Administration." That agency was abolished, and its functions were directed to be administered by the Secretary of the Treasury through the Bureau of Internal Revenue (now the Internal Revenue Service) in the Department of the Treasury. (See 27 U.S.C. § 201, Transfer of Functions.) Thereafter, the Bureau of Alcohol, Tobacco and Firearms (BATF) was established in 1972 and given the pertinent functions of the Internal Revenue Service with regard to wine regulation. (*Ibid.*) Subsequently, the Homeland Security Act of 2002 (6 U.S.C. § 101) transferred responsibility for the regulation of interstate commerce in alcoholic beverages to a newly formed Alcohol and Tobacco Tax Trade Bureau within the Department of the Treasury. (68 Fed.Reg. 3744 (Jan. 24, 2003).) For convenience, and because the regulations here at issue were adopted by the BATF, we shall continue to refer in this case to the BATF as the responsible regulatory agency.

for present purposes—directs the Secretary of the Treasury to promulgate such regulations "with respect to packaging, marking, branding, and *labeling . . . (1) as will prohibit deception of the consumer with respect to [alcoholic beverage] products . . . ; [and] (2) as will provide the consumer with adequate information as to the identity and quality of the products . . . .*" (Italics added.) To enforce these requirements, this section of the FAA Act also requires that any person who sells or ships wine in interstate or foreign commerce first obtain from the Secretary of the Treasury (or his or her designee) a certificate of label approval, or COLA, for each wine, and directs that no wine may be shipped or sold in interstate commerce unless it bears a label that has been reviewed and approved by the Secretary of the Treasury through issuance of a COLA. Finally, the section further provides that no wine label may be removed or altered "except as authorized by Federal law" or except pursuant to federal regulations "authorizing relabeling for purposes of compliance with the requirements of this subsection or of State law." (*Ibid.*)

Testifying in support of the legislation that became the FAA Act, Joseph H. Choate, former Chairman of the FAC Administration, explained that the goal was to continue the work of the recently invalidated FAC Administration. Adverting to the regulations mentioned above that recently had been adopted by the FAC Administration (*ante*, pt. II.B.1.f.), Mr. Choate explained that the purpose of those regulations—and of the new FAA Act—was to "to provide such regulations, not laid down in statute, so as to be inflexible, but laid down under the guidance of Congress, under general principles, by a body which could change them as changes were found necessary. [¶] *These regulations were intended to insure that the purchaser should get what he thought he was getting, that the representations both on labels and in advertising should be honest and straightforward and truthful. . . . [The consumer] should be told what was in the bottle, and all the important factors which were of interest to him about what was in the bottle.*" (Hearings before House Com. on Ways and Means on H.R. No. 8539, 74th Cong., 1st Sess., p. 10 (1935), testimony of Joseph H. Choate, italics added.) Similarly, Representative Thomas Cullen of New York, the author of the bill that became the FAA Act (see 79 Cong. Rec. (1935) 11713 et seq.), promoting his legislation on the floor of the House, asserted that the proposed bill was necessary in order to "do something to prevent the unfair trade activities of those in the industry who chisel and take advantage of the ignorance of the consumer by dishonest labeling . . . ." (Remarks of Rep. Cullen on H.R. No. 8539, 74th Cong., 1st Sess., 79 Cong. Rec. (1935) 11714; see generally *Regulation of American Wine Labeling, supra,* 11 U.C. Davis L.Rev. 115, 165–167.)

As with the 1906 federal Pure Food and Drugs Act, and by contrast to other legislation passed only days prior to adoption of the FAA Act in August

1935,[44] nothing in the body of the FAA Act reveals congressional intent to supersede concurrent (or more stringent) regulation of wine labeling by the states under their traditional police powers. As already explained, at the time Congress adopted the FAA Act in August 1935, the states, led by California (see *ante*, pt. II.B.1.d. & e.), were continuing to exercise their traditional police powers in this area. (See *ante*, pt. II.B.1.g., describing the then extant statutes of various states.)

Consistently with this history and contemporaneous practice, the bill's author, Representative Cullen, while promoting the bill embodying the FAA Act on the floor of the House, emphasized the cooperative, as opposed to preemptive, nature of the federal legislation. He asserted: "[W]e must do something to *supplement* legislation by the States to carry out their own policies. The liquor industry is too big and the constitutional and practical limitations on the States are so considerable that *they alone cannot do the whole job*." (Remarks of Rep. Cullen on H.R. No. 8539, 74th Cong., 1st Sess., 79 Cong. Rec. (1935) 11714, italics added; accord, H.R. Rep. No. 1542, 74th Cong., 1st Sess., pp. 2–3 (1935).)[45] Representative Cullen also assured the House that by enactment of the bill, "[n]o power is taken away from the States to provide such safeguards as they deem best for their own protection." (79 Cong. Rec., *supra*, 11174.)[46]

---

[44] In the Tobacco Inspection Act (Pub.L. No. 74-314 (Aug. 23, 1935) 49 Stat. 731)—enacted six days prior to adoption of the FAA Act—Congress used language making very clear its intent to adopt "uniform" national standards that would displace state regulation, thereby revealing that when the 74th Congress intended to make its regulation exclusive, it knew how to do so. As observed in *Florida Avocado, supra*, 373 U.S. 132, 147, with regard to the Tobacco Act, "Congress had declared 'uniform standards of classification and inspection' to be 'imperative for the protection of producers and others engaged in commerce and the public interest therein.' [Citation.] The legislative history was replete with references to a need for 'uniform' or 'official' standards, which could harmonize the grading and inspection of tobacco at all markets throughout the country. Under the statute a single set of standards was to be promulgated by the Secretary of Agriculture, 'and the standards so established would be the official standards of the United States for such purpose.' " No such language or comparable provision appears in the FAA Act, as adopted in 1935.

[45] See also House of Representatives Report No. 1542 (74th Cong., 1st Sess.) pages 13–14 (July 17, 1935) (citing the FAA Act's "relabeling" provision and noting that anticipated regulations would permit "appropriate additional labeling requirements imposed by a State pursuant to its own law not in conflict with the Federal requirements"). Bronco asserts that by this relabeling provision (see 27 C.F.R. § 4.30(b)(1)) and the cited comment, Congress had in mind only the authority of states, pursuant to the Twenty-first Amendment, to impose additional labeling requirements on alcoholic products imported for sale from other states, and did not contemplate that a state would be permitted to impose additional labeling requirements on wines destined for interstate commerce. We find no persuasive evidence of any such intent, however.

[46] Although on occasion we have questioned reliance upon the views of individual legislators as a basis upon which to discern the intent of the state Legislature (e.g., *People v. Dennis* (1998) 17 Cal.4th 468, 501, fn. 7 [71 Cal.Rptr.2d 680, 950 P.2d 1035], and cases cited), in the

Based upon this legislative history, and in light of the backdrop against which Congress acted—the prior decades of state legislation regulating the labeling or "misbranding" of wine as a general food and beverage product, or of wine specifically—we conclude that Bronco has failed to establish that Congress, at the time it enacted the FAA Act, acted with the "clear or manifest" purpose of preempting state statutes regulating wine labels.

### 2. *Post-1935 congressional and regulatory agency intent to preempt state wine label regulation*

 Bronco further suggests that *subsequent* to the enactment of 27 United States Code section 205(e) in August 1935 and the adoption, by agencies within the Department of the Treasury, of implementing regulations, both Congress and the federal regulators manifested intent that the federal wine labeling regulations would preempt more stringent state wine labeling regulations. Applying again, as we must, a presumption against preemption in this context, we inquire whether Congress or the regulatory arm established within the Department of the Treasury evinced a clear and manifest intent to preempt state wine labeling regulations such as California's section 25241. In so doing, we keep in mind the entire history of state regulation of wine labeling and the history and language of the FAA Act described above. As explained below, after reviewing (i) the early federal regulations and early state regulations that imposed standards higher than the federal regulations, (ii) subsequent federal regulations and pronouncements recognizing the applicability of state labeling law, and state wine regulations enacted in the mid-1970s (especially certain Oregon regulations, one of which is substantively similar to the challenged section 25241), and (iii) a 1988 amendment to the FAA Act, concerning health warnings on alcoholic beverages, we continue to find no evidence of any clear or manifest intent on the part of

present case Bronco does not challenge Representative Cullen's statements on that ground, and we recently observed in *Dowhal, supra,* 32 Cal.4th 910, that statements by a single member of Congress " 'can provide evidence of Congress' intent.' " (*Id.,* at p. 926, fn. 6.) Moreover, in the present case there are strong reasons to rely upon the quoted statements. Representative Cullen was the author of the FAA Act, and was looked upon as an authority during the House debates, fielding many questions from his colleagues. (E.g., Remarks of Rep. Doughton, 79 Cong. Rec. (1935) 11713 [Rep. Doughton, author of a prior version of the bill, observing on the House floor that Rep. Cullen "is more familiar with the provisions of this bill than myself or perhaps any other member . . . . He has given much study to the bill and is better qualified to explain it than I am . . . ."]; *id.,* pp. 11715–11718, 11727–11730, 11737, 11790, 11792–11793, 11797, 11799 [Rep. Cullen's various responses to questions, etc.].) In addition, Representative Cullen's comments essentially reiterated that which was set out in the House Report of the Ways and Means Committee, cited in the text above—and later incorporated into the Senate Report of the Committee on Finance on House Resolution No. 8870 (Fed. Alcohol Control Admin., Legis. History of Fed. Alcohol Admin. Act (Sept. 15, 1935) appen. IV, p. 166), and hence the cited comments did not amount merely to expressions of personal opinion. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 590 [128 Cal.Rptr. 427, 546 P.2d 1371].)

Congress or the responsible federal agency to preempt state wine labeling regulation such as section 25241. Indeed, the evidence demonstrates that the federal agency has long contemplated or at least acquiesced in concurrent and stricter state regulation.

a. *Federal and California regulations issued after passage of the FAA Act*

As noted above, prior to adoption of the FAA Act, California had in place, by December 1934, specific and detailed wine regulations restricting, among other things, the use of place names on wine labels. (See *ante*, pt. II.B.1.e.) In bulletins and reports issued in the years immediately thereafter, the California Department of Public Health touted its enforcement of those state regulations, which it described as requiring the "honest labeling of wines."[47]

In late December 1935, four months after adoption of the FAA Act, and one year after California's adoption of its own post-Prohibition-repeal wine labeling regulations, valid federal wine labeling regulations were approved, and those regulations became effective on March 1, 1936. (U.S. Dept. Treas., Fed. Alcohol Admin., Regs. No. 4 Relating to Labeling and Advertising of Wine (Dec. 30, 1935) arts. I-VII, 1 Fed.Reg. 83 (Apr. 1, 1936) (hereafter Regulations No. 4); see, generally, *Controls Over Labeling, supra*, 7 Law & Contemp. Probs. 645, 652, fn. 25 et seq.)

The federal labeling regulations, as amended in 1938 (see 3 Fed.Reg. 2093 (Aug. 26, 1938)) and thereafter, presently are designated 27 Code of Federal Regulations, sections 4.20 through 4.39. One key provision—Code of Federal Regulations section 4.25(b)(1)(i) and (iii)—states that a wine is "entitled" to be described with an appellation of origin if "[a]t least 75 percent of the wine is derived from fruit . . . grown in the appellation area indicated" *and* "it conforms to the laws and regulations of the named appellation area governing the *composition, method of manufacture*, and *designation* of wines made in such place." (Italics added.)[48]

---

[47] See California Department of Public Health, Weekly Bulletin (Feb. 19, 1938) page 14; *id.*, at page 13 (describing enforcement of the California wine quality standards and noting their adoption by the beverage control authorities in Oregon, Virginia, and Arizona); see also Thirty-sixth Biennial Report of the California Department of Public Health (Sept. 1940) page 177; Thirty-fifth Biennial Report of the California Department of Public Health (Sept. 1938) page 142; Thirty-fourth Biennial Report of the California Department of Public Health (Sept. 1936) page 100.

[48] "Composition" refers to the ingredients used to make a wine (27 C.F.R. § 4.34) and generally consists simply of grapes. "Method of manufacture" refers to approved wine treatment materials and processes. (27 C.F.R. § 24.175 et seq.) "Designation of wines" is a concept distinct from brand name or appellation; it refers to the class or type of wine rather than the source or origin of the wine. (27 C.F.R. §§ 4.32(a)(2), 4.34.) For example, a wine may

Soon after the adoption of this federal provision in 1938, a California statute was enacted, and two regulations were adopted, all three of which imposed *more stringent* California wine labeling requirements. First, in 1939, the Legislature amended the state ABC Act (Bus. & Prof. Code, § 23000 et seq.) to prohibit the use on wine labels of the phrase "California Central Coast counties dry wine," unless the wine was in fact made *entirely* from grapes grown in specified Central Coast counties. (Stats. 1939, ch. 1033, §§ 1–4, p. 2838; see Bus. & Prof. Code, §§ 25236–25238.) Second, by 1942, a regulation had been adopted imposing a similar 100 percent grape origin requirement for any wine labeled as " 'California' or any geographical subdivision thereof." (See Cal. Dept. of Pub. Health, Regs. Establishing Stds. of Identity, Quality, Purity and Sanitation and Governing the Labeling and Advertising of Wine in Calif. (May 23, 1942) art. I, § 2(aa)[49] (hereafter 1942 Regulations), presently found at Cal. Code Regs., tit. 17, § 17015, subd. (a)(1).) Third, by 1942 a California regulation barred the sale of wines labeled with so-called coined (or semi-generic) brand names if the "brand designation resembles an established wine type name such as . . . Madeira, . . . Port, . . . Claret, [or] Burgundy, etc. . . . ." (See 1942 Regs., art. II, § 8.) Under this and subsequent versions of the same regulation, a label such as "Burgundy brand" was long barred in California.[50]

---

be designated by class as a grape wine, sparkling grape wine, or carbonated grape wine (27 C.F.R. § 4.21), or by the grape varietal. (27 C.F.R. §§ 4.23, 4.24, 4.28.)

As Bronco concedes, California long has enforced regulations that differ from the federal regulations with respect to method of manufacture. (See, e.g., Cal. Code Regs., tit. 17, §§ 17005 [providing, concerning "cellar treatment," that "[i]n case of conflict between Federal and State laws or regulations the California law or regulation shall take precedence"], 17010 [adopting regulations more restrictive than those contained in federal regulations concerning the use of sugar in the production or cellar treatment of wine].) Bronco contrasts what it asserts are these and similar permissible and specifically sanctioned departures from federal regulations with what it contends are impermissible deviations from federal *labeling* standards— especially federal regulations concerning the use of brand names on labels.

[49] This requirement may have gone into effect earlier than 1942. A predecessor to the regulations of 1942 had been adopted in April 1940. (See 1942 Regs., cover page ["These regulations supersede the Definitions and Standards—Wines, adopted December 1934, as amended, and Rules Governing California Vintage Wines, adopted April 6, 1940"].) The December 1934 regulations, as amended through January 18, 1936, have been described *ante*, part II.B.1.d. Despite the efforts of librarians throughout the state, we have been unable to locate the intervening *regulations*—if indeed there were any—or the 1940 Rules Governing California Vintage Wines.

Article III, section 12(1) of the 1942 Regulations also provided, consistently with many of the prior statutes and regulations described earlier, that wine labels "shall not contain [¶] (1) *any statement, design, device or representation which is false or misleading in any material particular.*" (Italics added.)

[50] That California regulation, as adopted in the early 1940s, was in force until the mid-1980s. (See former Cal. Admin. Code, tit. 17, §§ 17001(a) & 17075(c)(2) (1978).) Oregon as well had a similar "coined" brand-name provision until the mid-1980s. (See Or. Admin. R. 845-10-285(3)(a) (1978).)

The first two California labeling rules described above plainly imposed (and still impose) a more stringent standard than the 75 percent requirement set forth in the federal appellation of origin regulation. (Regs. No. 4, § 25, as revd., 3 Fed.Reg. 2093, 2096 (Aug. 26, 1938), presently found at 27 C.F.R. § 4.25(b)(1)(i).) The third provision described above prohibited name types that the federal regulations have permitted since 1941 upon a proper showing. (See 27 C.F.R § 4.33(b), as revd., 6 Fed.Reg. 2874 (June 13, 1941) [disallowing such a geographic name *unless* a federal officer finds the name, either qualified by word "brand" or otherwise, "conveys no erroneous impressions as to the . . . origin . . . of the product"].)

Although the parties dispute whether the first two state rules cited above are sanctioned by title 27 Code of Federal Regulations section 4.25(b)(1)(iii)—the federal provision that expressly authorizes state regulation concerning the "composition" (the grape ingredients) or "designation" of wine (the class or type of wine, as distinct from its source or origin)—the third California regulation, the coined brand-name provision, cannot be so distinguished. That state regulation plainly controlled, more strictly than the federal rules, not the mere composition or designation of wines, but the brand-name labeling of wines.

In any event, there is no indication that any question previously has arisen concerning the authority or enforceability of the California statute[51] or of either regulation. Indeed, since mid-1939, the California Legislature has authorized state wine regulations that are stricter than federal wine regulations,[52] and for nearly the past 35 years, the Legislature expressly has authorized state wine regulations to *"differ from or be inconsistent with"*

---

[51] The appellation "California Central Coast counties" has since fallen into disuse. (See *Regulation of American Wine Labeling, supra*, 11 U.C. Davis L.Rev. at p. 143.)

[52] See Statutes 1939, chapter 60 (establishing the Health & Safety Code), page 992 (enacting former § 26541, requiring that certain state food and distilled spirits regulations not impose a standard higher than certain federal regulations—but *not* requiring such conformity with regard to state *wine* regulations); Statutes 1941, chapter 1042, section 3, page 2698 (enacting former § 26540.2, authorizing the State Board of Health to promulgate wine regulations), and section 4, page 2699 (amending § 26541 to specify that the section's general prohibition on imposition of higher state standards concerning food and distilled spirits *"shall not apply to wine"*). (Italics added.) Former section 26541's exemption of state wine regulations from the general rule against imposition of higher state standards relating to other foods and distilled spirits continued through various amendments of that former section, until that exemption ultimately was recast in 1970 as a positive right of state regulators to "differ from or be inconsistent with" corresponding federal wine regulations. (Stats. 1970, ch. 1573, § 5, p. 3255; see *post*, fn. 53 [quoting current Health & Saf. Code, § 110525]; cf. 44 Ops.Cal.Atty.Gen. 122, 125 (1964) [discussing similar history of Health & Saf. Code, former § 26542].)

federal wine regulations (Health & Saf. Code, § 110525, italics added);[53] yet there is no indication the federal government has taken issue with this long-standing assertion of broad state authority.[54]

The history of the early post-Prohibition-repeal California and federal wine labeling regulations reveals no evidence of any clear or manifest intent on the part of Congress, or the regulatory agency charged with executing the relevant law, to preempt state wine labeling regulation such as section 25241. This history suggests, instead, the opposite.

b. *Modification of federal regulations in the 1970s and 1980s, and adoption by Oregon of its more stringent wine labeling regulations*

Beginning in the mid-1970s, the BATF, which in 1972 had been delegated the task of creating and enforcing federal regulations (see *ante*, fn. 43), began to consider proposals to further define and regulate appellations of origin. In connection with that inquiry, the BATF also began to consider how better to regulate the use in brand names of terms of "geographic or viticultural significance." (42 Fed.Reg. 30517, 30518 (June 15, 1977).)[55] In 1978 the BATF adopted, but then postponed enforcement of, new brand-name rules,[56] and it also adopted new regulations concerning appellations of origin—

---

[53] In 1970, Health and Safety Code former section 26515 was amended to specify: "Standards of identity and quality for wine adopted pursuant to this section *may differ from or be inconsistent with* the standards promulgated by [the federal regulators in the Department of the Treasury]." (Stats. 1970, ch. 1573, § 5, p. 3255, italics added.) The statute today provides the same. (Health & Saf. Code, § 110525 ["Standards of identity and quality for wine adopted pursuant to this section may differ from or be inconsistent with the standards promulgated by the Secretary of the Treasury pursuant to the Federal Alcohol Administration Act"].)

[54] Indeed, other jurisdictions, since 1976, expressly have recognized and incorporated California's more stringent "100 percent rule" into their own state wine regulations (see 16 Tex. Admin. Code, § 45.45(b) & (c) (eff. Jan. 1976) ["all grape wine bearing labels showing 'California' as the origin of such wine shall be derived 100 % from grapes grown and wine from such grapes fermented within the State of California"]; Wash. Admin. Code, § 314-24-003(5) [same]), and the federal regulating body itself has recognized California's "100 percent rule" as a valid exercise of state regulatory power. (See 58 Fed.Reg. 65295, 65297 (Dec. 14, 1993) [acknowledging "California's authority to enforce its own labeling requirements within the area of its jurisdiction"].)

[55] Under the then existing federal regulations, use of geographic brand names was permitted if (i) the word "brand" appeared after the brand name (27 C.F.R. § 4.33(b) (1976)) or (ii) at least 75 percent of the grapes originated in the appellation suggested by the brand name (*id.*, § 4.25 (1976)).

[56] Although the BATF in 1978 adopted new rules regulating the use in brand names of terms of geographic or viticultural significance, it delayed implementation of those rules, first until 1983 and ultimately until 1986. (43 Fed.Reg. 37672, 37674, 37678 (Aug. 23, 1978).) The brand-name rules that were adopted in 1978 (but never became effective) would have provided: "A brand name of viticultural significance may not be used unless the bottling winery is located within the geographical area used in the brand name, and the wine meets the appellation of origin requirements for the area named" (meaning at least 75 percent of the

including a new subcategory within appellations of origin known as "viticultural areas." (43 Fed.Reg. 37672, 37674, 37678 (Aug. 23, 1978).)[57] The 1978 federal appellations of origin regulation expressly recognized the enforceability of state laws in relation to placing a "viticultural area" designation on a wine label, making the right to so label a wine contingent on compliance with, among other things, *the laws and regulations of all of the States contained in the viticultural area.*" (27 C.F.R. former § 4.25a(e)(3)(iv) (1978–1981); *id.,* former § 4.25a(e)(3)(v) (1981–1986), italics added.)[58]

Prior to and during this same period of federal regulatory action and consideration of geographic brand-name regulations (see *ante,* fn. 56), in 1977 the State of Oregon departed from the federal labeling regulations in substantial ways, imposing more stringent state rules concerning matters such as percentage content of Oregon appellation wines,[59] use of "semi-generic"

---

grapes used to make the wine must be from that area). (43 Fed.Reg. 37672, 37678 (Aug. 23, 1978).) Alternatively, the 1978 regulation, as initially adopted, would have permitted use of a brand name of viticultural significance if "the brand name is qualified by the word 'brand' immediately following the brand name in the same size of type and as conspicuous as the brand name itself." (*Ibid.*)

As noted, implementation of the brand-name aspects of the rules repeatedly was delayed. (See 48 Fed.Reg. 2762 (Jan. 21, 1983); 50 Fed.Reg. 758 (Jan. 7, 1985).) Meanwhile, in 1984 the BATF retreated from its 1978 proposal concerning the use of brand names and proposed instead to address the issue by adopting either that plan, or one of three alternative plans. (49 Fed.Reg. 19330, 19331–19332 (May 7, 1984); see *post,* fn. 70 [describing the BATF's 1984 comments concerning proposed branding rules].) As explained below, based upon further review and the comments concerning its 1984 proposal, the BATF ultimately adopted, effective July 7, 1986, the regulation at issue in the present case. (51 Fed.Reg. 20480 (June 5, 1986).)

[57] An "appellation of origin" was, and continues to be, defined as a political division or subdivision—for example, a state, or group of states, or a county, or group of counties–in which grapes used to make a wine are grown. (See 27 C.F.R. § 4.25(a)(1)(i)–(vi).) A "viticultural area," by contrast, is a special subcategory within an appellation of origin (see 27 C.F.R. § 4.25(a)(1)(vi)) demarked not by political boundaries, but by geographic terms and characteristics.

[58] The other requirements for "viticultural area appellation" labeling were (and remain) (i) that the area be recognized under part 9 of 27 Code of Federal Regulations; (ii) that the wine be made from at least 85 percent grapes grown in that viticultural area; and (iii) that the wine be fully "finished" within the state (or one of the states) of the viticultural area. (27 C.F.R. § 4.25(e)(3)(i), (ii) & (iv).)

[59] An administrative regulation of the Oregon Liquor Control Commission (former Or. Admin. R. 845-10-292(6)(c), eff. Mar. 1, 1977, currently Or. Admin. R. 845-010-0920(1) & (2) (2004)), requires: "(1) An appellation of origin must appear on every wine brand label in direct conjunction with, and in lettering as conspicuous as, the wine's class or type designation. The lettering must be at least two millimeters in height. [¶] (2) No person may sell or offer to sell a wine, claiming or implying a certain appellation of origin anywhere on its label, unless 100 percent of the grapes used in its production grew within the legal boundaries of that appellation of origin. . . ." The corresponding federal regulations, by contrast, impose only a 75 percent rule for appellations of origin (27 C.F.R. § 4.25(b)(1)(i)), an 85 percent rule for American viticultural areas (27 C.F.R. § 4.25(e)(3)(ii)), and a 95 percent rule for individual vineyard appellations (27 C.F.R. § 4.39(m)).

place names,[60] percentage content of varietal wines,[61] use of the term "estate bottled,"[62] and the use of geographic brand names.[63] In each of these respects, Oregon reserved the right to *disapprove* wine labels that had been granted a valid federal certificate of label approval.[64]

For present purposes, the most relevant of these various departures from federal wine labeling regulations concerns Oregon's geographic brand-name rule.

Effective March 1, 1977, Oregon Administrative Rule 845-10-292(6)(e) provided that appellation names—including the names of Oregon counties, and the names of Oregon wine-producing regions Willamette Valley, Umpqua Valley, and Rogue Valley—"*shall not be used in a brand name, in the name of a winery or in any other manner on a label unless 100 percent of the grapes used to produce the wine were grown within the boundaries of that appellation of origin.*" (Italics added.) The regulation included a grandfather clause permitting "use by a winery of a brand name which has been in use *by that winery* on its approved labels prior to *January 1, 1977.*" (Or. Admin. R. 845-10-292(6)(e) (1977), italics added.)[65] Like the other Oregon labeling rules that specifically exceed the federal regulations, this Oregon geographic

---

[60] Compare Oregon Administrative Rule 845-10-292(5), effective March 1, 1977, currently Oregon Administrative Rule 845-010-0930 (2004) (barring use of "semi-generic" place names [such as Burgundy, Chablis, and Chianti] on Oregon wine labels) with 27 Code of Federal Regulations section 4.24(b)(2) (permitting those same names on federally approved labels).

[61] Compare Oregon Administrative Rule 845-10-292(3)(a), effective March 1, 1977, currently Oregon Administrative Rule 845-010-0915(1) (2004) (a varietal name [such as Chardonnay or Pinot Noir] may not be used on an Oregon wine label unless at least 90 percent of the wine's grapes are of that varietal) with 27 Code of Federal Regulations section 4.23(b) (permitting use of a varietal name on federally approved labels if only 75 percent of the wine's grapes are of that varietal).

[62] Compare Oregon Administrative Rule 845-10-292(4)(c), effective March 1, 1977, currently Oregon Administrative Rule 845-010-0925 (2004) (barring use of the term "estate bottled" on Oregon wine labels unless, among other things, the wine's grapes were grown within five miles of the winery) with 27 Code of Federal Regulations section 4.26 (permitting the term "estate bottled" on federally approved labels without requiring that the wine's grapes have been grown within five miles of the winery).

[63] See Oregon Administrative Rule 845-10-292(6)(e), effective March 1, 1977, currently Oregon Administrative Rule 845-010-0920(4)(f) (2004), discussed in the text, *post.*

[64] See Oregon Administrative Rule 845-10-290(2) (1977), currently Oregon Administrative Rule 845-010-0290(2) (2004) (providing that each wine label must (i) receive a federal COLA *and* (ii) comply with the more stringent Oregon rules concerning percentage contents for appellations of origin, semi-generic names, grape content of varietal wines, brand names, and use of the term "estate bottled").

[65] We note the narrowness of this grandfather provision compared with the federal grandfather clause that we consider in the present case. In addition to the earlier cutoff date (1977 under the state regulation, as compared with 1986 under the federal regulation), the phrasing of the provision suggests that the right of grandfathered use may not be transferred to another entity, as was done in the present case. (Cf. Comment, *On Vino Veritas? Clarifying the Use of Geographic References on American Wine Labels* (2001) 89 Cal. L.Rev. 1881, 1912–1913.)

brand regulation remains in force today, more than a quarter-century after its adoption. (See Or. Admin. R. 845-010-0920(4)(f) (2004)).[66]

We find these Oregon regulations relevant to our current inquiry in three interrelated respects.[67] First, the state regulations—especially the strict geographic brand-name rule, and the estate-bottled rule—demonstrate that Oregon has long imposed labeling rules that are both (i) more stringent than the federal rules *and* (ii) go far beyond 27 Code of Federal Regulations section 4.25(b)(1)(iii)'s authorization for states to regulate the "composition, method of manufacture, [or] designation of wines . . . ."

Second, it is clear that the BATF has long been aware of these stricter Oregon rules and apparently views them as enforceable. The Oregon regulations had been in place for approximately 16 months at the time the BATF

---

[66] As most recently amended, the regulation provides that appellation names—again including the names of Oregon counties, and the names of Oregon wine-producing regions Willamette Valley, Umpqua Valley, and Rogue Valley or "words that may be mistaken for an approved appellation of origin in a brand name [or] in a winery name, or in any other manner on a wine label" may not be used "unless the wine meets the requirements for use of that appellation of origin" (Or. Admin. R. 845-010-0920(4)(f) (2004)), that is, "100 percent of the grapes used in its production grew within the legal boundaries of that appellation of origin." (*Id.*, 845-010-0920(2) (2004).) Like the original version of the regulation, the provision also retains a restrictive grandfather clause: "A winery may continue to use any brand name that *it has used* on its approved label since before *January 1, 1977.*" (*Id.*, 845-010-0920(4)(f) (2004), italics added.)

[67] We reject Bronco's preliminary argument, raised in its supplemental briefs, that Oregon Administrative Rule 845-010-0280 implicitly nullifies Oregon wine regulations discussed above, such as the estate-bottled provision and the geographic brand-name provision.

The cited rule addresses "Standards of Identity and Prohibited Practices Concerning Wine" and provides that Oregon regulations concerning those two topics, set forth in Oregon Administrative Rule "845-010-0905 [definitions] *and* 845-010-0940 [use of water, wine spirits and other sweetening agents]," shall prevail over any less stringent or restrictive federal law. (Or. Admin. R. 845-010-0280 (2004), italics added.) As Bronco observes, in an introductory sentence the regulation *also* states: "The Commission adopts, by reference, 27 CFR [parts] 4 [the federal wine labeling regulations] and 24[] [wineries and wine-making regulations] (1986). These regulations of the Bureau of Alcohol, Tobacco [] and Firearms of the United States Department of Treasury apply to all wine sold in Oregon by a Commission licensee." (*Ibid.*)

Bronco reads this language as adopting generally the federal regulations concerning, for example, the use of the term "estate bottled" and geographic brand names for all Oregon wines sold in that state—and hence as implicitly repealing or at least superseding those Oregon rules insofar as in-state sales of Oregon wines are concerned. Bronco's interpretation of the Oregon rules is belied by Oregon Administrative Rule 845-010-0910(2) (2004), which plainly states that Oregon Administrative Rules "845-010-0905 *through* 845-010-0940 [i.e., including Oregon's estate-bottled and geographic brand-name provisions] apply to all grape wines *produced or bottled in Oregon* . . ."—that is, regardless where such wines are *sold*—and that "[*t*]*hese rules prevail in any conflict between . . . other rules in Chapter 845, Division 010.*" (Italics added.)

adopted its 1978 regulation concerning the use of "viticultural area" appellations on wine labels. That 1978 BATF regulation, as noted above, *expressly acknowledged and required compliance with "the laws and regulations of all the States contained in the viticultural area."* (27 C.F.R. former § 4.25a(e)(3)(iv) (1978–1981); *id.*, former § 4.25a(e)(3)(v) (1981–1986), italics added.) By so providing, the BATF, as of 1978, acknowledged the propriety and enforceability of the more stringent labeling rules promulgated by the states.

Indeed, any doubt in this regard is dispelled by the BATF's action and comments seven years later (in late January 1986) when, in the course of repealing as a *federal* requirement 27 Code of Federal Regulations former section 4.25a(e)(3)(v)'s rule concerning compliance with state regulations relating to viticultural areas, the BATF expressly and repeatedly acknowledged both the existence and the *enforceability* of Oregon's "more stringent" wine labeling regulations.[68] The BATF explained that although it had decided, with regard to viticultural areas, to eliminate compliance with state laws *as a federal requirement*, the underlying substantive state law requirements relating to viticultural areas would remain, to be enforced solely by the respective states. The BATF observed: *"State laws and regulations of the*

---

[68] As the BATF explained, prior to adoption of its 1978 appellation rules, appellations of origin relating to American wines generally were characterized as regions or places delimited by political boundaries, such as states or counties. As observed *ante*, at footnote 57, the 1978 appellation rules expanded the concept of appellations of origin by additionally including under that term "viticultural areas"—that is, grape-growing regions—defined by geographic features, and not political lines. Because some of these viticultural areas straddled states, a problem eventually arose concerning the federal requirement, then set out in 27 Code of Federal Regulations former section 4.25a(e)(3)(v) (1981–1986), that in order to employ a viticultural area designation, a winery must "conform[] to the laws and regulations of all the States contained in the viticultural area." Specifically, the BATF noted (51 Fed.Reg. 3773, 3774 (Jan. 30, 1986)), if a wine were to use the viticultural area designation "Columbia Valley" (a federally recognized viticultural area straddling Oregon and Washington), the winery producing the wine would be required to comply with Oregon's state regulations, even if the grapes were grown in the Washington part of the Columbia Valley and the wine was made and finished only in Washington. Moreover, the BATF observed, "regulations of Oregon and Washington differ greatly regarding the production *and labeling* of wine. *Oregon regulations are more stringent than Federal regulations."* (51 Fed.Reg. 3773, 3774 (Jan. 30, 1986), italics added.) The BATF observed that because former section "4.25a(e)(3)(v) required compliance with laws and regulations of all states within a multistate viticultural area, regardless of where the wine is fermented or finished, wine made from grapes originating and fermented in Washington, and finished and bottled within Washington was, nevertheless, subjected to Oregon law and regulations if the wine claimed a multistate viticultural area appellation such as Columbia Valley." (51 Fed.Reg. 3773, 3774 (Jan. 30, 1986).) And yet, the BATF determined, "[a] *Federal requirement* for compliance with State laws and regulations is both unnecessary and difficult for the Federal Government to enforce *due to the multitude of state and local laws and regulations."* (*Ibid.*, italics added.) Accordingly, the BATF concluded, it did not "believe that Federal regulation should impose the State laws or regulations of one state upon transactions occurring in other states." (*Ibid.*)

*state in which the wine was fermented or finished will, of course, continue to apply to the producing winery. These state laws and regulations are enforced by the state involved."* (51 Fed.Reg. 3773, 3774 (Jan. 30, 1986), italics added.)[69]

Third and finally, the Oregon geographic brand-name regulation, in particular, sheds light upon the BATF's apparent understanding of the grandfather clause at issue in this case. Almost 10 years after Oregon adopted its restrictive geographic brand-name labeling regulation, the BATF, after considering various options over the preceding decade (see *ante*, fn. 56, and *post*, fn. 70), amended 27 Code of Federal Regulations section 4.39(i)(1) in the manner at issue in this case, to prohibit the use of labels with brand names implying that a wine was made with grapes grown in the area suggested by the brand name, unless at least 75 percent of the grapes used to make the wine were in fact from that area. But, as noted above, the new federal regulation also contained a grandfather clause that lies at the center of the controversy in this case, under which such otherwise misleading labels are not prohibited, so long as the label was in use prior to July 1986 *and* the label discloses the true appellation of origin of at least 75 percent of the grapes actually used to make the wine inside the bottle. (*Id.*, § 4.39(i)(2)(ii).)[70]

In view of the BATF's explicit acknowledgement, only four months prior to its adoption of the provision at issue in the present case, that the Oregon labeling regulations are proper and enforceable (see 51 Fed.Reg. 3773, 3774 (Jan. 30, 1986)), it is reasonable to assume that the BATF, when it adopted

---

[69] Underscoring this point, the BATF observed in the summary of its decision that although "the requirement to comply with State laws and regulations is removed as a Federal requirement," still, "[t]he State laws and regulations remain in effect and *will continue to be enforced by the agencies of the states involved in winemaking.*" (51 Fed.Reg. 3773 (Jan. 30, 1986), italics added.)

[70] See 27 Code of Federal Regulations section 4.39(i), quoted in full *ante*, at footnote 7. As Bronco observes, in a notice of proposed rulemaking issued in 1984—two years prior to the BATF's adoption of the present brand-name provision and its grandfather clause—the BATF stated that it did not wish to adopt a regulation that "may be too restrictive." (49 Fed.Reg. 19330, 19331 (May 7, 1984).) After outlining four possible regulatory responses to the brand-name problem, the BATF stated, in reference to a possible rule strictly regulating the use of terms of viticultural significance in brand names, its "belie[f that] the wine industry should be allowed flexibility in selecting brand names under which to market their products *without having a whole class of brand names become totally unusable.*" (*Id.*, at pp. 19331–19332, italics added.) As explained *post*, part II.D.1, Bronco suggests that this language supports a conclusion that two years later, when the BATF adopted 27 Code of Federal Regulations section 4.39(i)(2)(ii) and concluded that the new rule "will provide the industry with sufficient flexibility in designing their labels, while at the same time providing consumers with protection from any misleading impressions that might arise from the use of geographic brand names" (51 Fed.Reg. 20480, 20482 (June 5, 1986)), the BATF, in so acting, engaged in a "careful balancing of federal policy objectives" and intended to *allow* the kind of brand-name labeling here at issue.

the grandfather clause, was aware of Oregon's "more stringent" geographic brand-name labeling rule. And yet the BATF said nothing in its new provision or in its discussion of that new rule to suggest that the new rule preempted Oregon's long-standing, closely related, and more stringent brand-name labeling rule.

■■■ Accordingly, contrary to Bronco's theory that the BATF itself viewed or views its wine labeling regulations as preempting more stringent state regulations, we conclude that the history of the federal and Oregon wine labeling regulations in the mid-1970s through the present reveals no evidence of any such intent. Instead, that history strongly indicates that the BATF has long contemplated that the states will enforce their own stricter labeling requirements, and that the agency did not and does not view its labeling regulations as preempting more stringent state regulations such as section 25241.

> c. *Amendment of the FAA Act in 1988, and corresponding regulations, requiring health warning labels and expressly preempting state regulation of such labels*

In 1988, Congress amended the FAA Act to require that all wine labels (and the labels of other alcoholic beverages) contain a warning on the back label, as follows: "GOVERNMENT WARNING: (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) Consumption of alcoholic beverages impairs your ability to drive a car or operate machinery, and may cause health problems." (27 U.S.C. § 215(a).) Congress gave the BATF authority to issue appropriate regulations to enforce Congress's will (27 U.S.C. § 215(b) & (d)), and, stressing the perceived need in this particular area for Congress to "exercise the full reach of the Federal Government's constitutional powers in order to establish a comprehensive Federal program" (27 U.S.C. § 213), further provided expressly for federal preemption of such health warnings on alcoholic beverage labels: "No statement relating to alcoholic beverages and health, other than the statement required by section 215 of this title, shall be required under State law to be placed on any container of an alcoholic beverage . . . ." (27 U.S.C. § 216.) The BATF responded by adopting implementing regulations (see 27 C.F.R. § 16.20 et seq.) as well as a provision expressly reaffirming the preemptive effect of that regulation. (27 C.R.F. § 16.32.)

■■■ As the United States Supreme Court has observed, " 'an express definition of the pre-emptive reach of a statute . . . supports a reasonable inference . . . that Congress did not intend to pre-empt other matters.' " (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 541 [150 L.Ed.2d 532, 121 S.Ct. 2404], quoting *Freightliner Corp. v. Myrick* (1995) 514 U.S. 280,

288 [131 L.Ed.2d 385, 115 S.Ct. 1483]; accord, *Bass River Associates v. Mayor, Tp. Com'r* (3d Cir. 1984) 743 F.2d 159, 162 ["It is of some interest and no small significance that a provision in the same title does provide for federal preemption of state and local laws or regulations . . . ."].)

This inference and these observations are especially apt here, in light of the history described above, which strongly suggests (i) no intent on the part of Congress, in 1935 or thereafter, to preempt any *other* category of state wine label laws, and (ii) the BATF's acknowledgement of, and apparent acquiescence in, the more stringent wine labeling laws of the states, and specifically those of Oregon. Indeed if Congress, as Bronco asserts, by enactment of the FAA Act in 1935, already had generally preempted state regulation of wine labels, there would have been no need for any express preemption clause or preemption regulation with respect to the 1988 health warnings for wine labels.

Once again, this history reveals no evidence of any clear or manifest intent on the part of Congress or the BATF to preempt state wine labeling regulation such as section 25241. Instead, the history supports an opposite inference that neither Congress nor the BATF intended to preempt state wine labeling laws such as section 25241.

### D.

Having concluded that Bronco has failed to carry its burden of establishing clear or manifest intent on the part of Congress, or congressional intent as interpreted by the BATF, to preempt the traditional exercise of state police power such as the wine labeling regulation found in section 25241, we proceed under the presumption that no such preemption was intended. We bear this presumption in mind when we consider below Bronco's assertion that section 25241, by imposing a labeling requirement that is more exacting than the federal requirement, is impliedly preempted by federal law.

1. *Does section 25241, by prohibiting, with respect to Napa County, what the federal grandfather clause does not prohibit, stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress?*

In support of its assertion that section 25241 frustrates the full purposes and objectives of federal law, Bronco cites various cases in which courts have made such (or similar) findings in other contexts. (*Geier, supra,* 529 U.S. 861, 881 [state tort action based upon failure to equip automobile with airbags would frustrate federal highway safety standards permitting car

makers to employ passive restraint devices other than airbags]; *Barnett Bank, supra,* 517 U.S. 25, 31 [state statute barring national bank from selling insurance would obstruct federal statute that permitted, but did not require, national banks to sell insurance]; *Lawrence County, supra,* 469 U.S. 256, 260–268 [state law requiring certain method of distribution of federal funds held to obstruct federal statute that was designed to provide local governments freedom to spend those federal funds "as they saw fit"]; *McDermott v. Wisconsin* (1913) 228 U.S. 115, 129 [57 L.Ed. 754, 33 S.Ct. 431] [state statute that required removal of certain labels on syrup was preempted by federal statute under which such labels had been approved]; *Dowhal, supra,* 32 Cal.4th 910, 929, 935 [state law warnings concerning nicotine frustrated the purposes of the federal Food, Drug & Cosmetic Act].)

The Department and the NVVA, by contrast, distinguish each of these cases and rely instead primarily upon *Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 68–70 [154 L.Ed.2d 466, 123 S.Ct. 518], in which the high court declined to find preemption of a state tort action seeking to impose standards for boat propeller guards, even in the face of a decision by federal authorities not to impose any general or universal propeller guard requirements. (See also, e.g., *California Coastal Comm'n v. Granite Rock Co.* (1987) 480 U.S. 572, 582–584 [94 L.Ed.2d 577, 107 S.Ct. 1419] (*Granite Rock Co.*) [federal approval of mining project was not frustrated by California's stricter environmental requirements; indeed, the federal regulations assumed the applicability of the state regulations]; *Hillsborough County v. Automated Medical Labs.* (1985) 471 U.S. 707, 720–721 [85 L.Ed.2d 714, 105 S.Ct. 2371] (*Hillsborough County*) [stricter local regulations concerning plasma donors posed no serious obstacle to related federal regulations]; cf. *Exxon Corp. v. Governor of Maryland* (1978) 437 U.S. 117, 132 [57 L.Ed.2d 91, 98 S.Ct. 2207] (*Exxon*) [no preemption of state discriminatory pricing regulations barring conduct that triggered a limited defense under federal law].)

Bronco asserts that section 25241 frustrates the purposes of Congress, or at least of the BATF's regulation establishing a grandfather clause (27 C.F.R. § 4.39(i)(2)(ii)), in "four interrelated ways." Bronco argues: (i) Section 25241 prohibits precisely what the regulation establishing the grandfather clause "expressly and unambiguously authorizes"; (ii) the regulation establishing the grandfather clause "embodies a specific determination by federal regulators that the use of established geographical brand names for wines from a variety of appellation areas would not be misleading if the labels also featured the true appellation of origin"; (iii) the regulation establishing the grandfather clause "reflects a careful balancing of federal policy objectives" and a determination by the BATF that the regulations should not render a "whole class" of established brand names "totally unusable" (see *ante,* fn. 70); and (iv) the BATF, in adopting its rule and regulation establishing a grandfather

clause, expressly rejected as "too restrictive" a general rule that would have confined the use of established geographic brand names to wines made from the region referred to in the brand name.

In reply, the Department and the NVVA assert that section 25241 is in aid of, and consistent with, Congress's general and overriding purpose in adopting 27 United States Code section 205(e) in 1935—namely, the prevention of consumer deception relating to wine labeling. The Department and the NVVA claim that Bronco has failed to identify any congressional purpose with which section 25241 interferes. In this respect, the NVVA argues, "[t]he assertion that the grandfather clause represents a 'deliberate federal policy determination' or 'regulatory balance' assumes that Congress or [the] BATF identified some affirmative reason that the government of the United States wanted Bronco to be able to sell wine made from non-Napa grapes under labels saying 'Napa.' " The Department asserts there is no support for the proposition that federal regulators have concluded that in all cases, the presence of a true appellation of origin dispels the effects of misrepresentations reflected in a brand name.

Both the Department and the NVVA acknowledge that in 1984 the BATF, in discussing various options for addressing the problems posed by geographic brand names, asserted that it did not believe it appropriate to issue regulations that "may be too restrictive" or render "totally unusable" a "whole class" of brand-name labels. (49 Fed. Red. 19330, 19331 (May 7, 1984) see *ante*, fn. 70.) But, the Department and the NVAA argue, those statements suggest at most that the BATF did not believe it prudent to impose a *national*, or total, ban on the use of existing brand-name labels that suggested an origin of wine different from the actual origin of the grapes used in making the wine. The Department and the NVVA argue that the circumstance that the BATF did not see fit "totally" to eliminate a "whole class" of existing labels on a national basis without regard to the policies of a particular state does not provide evidence establishing that section 25241 frustrates any significant federal purpose. In this respect, the NVVA asserts that when, as here, the objectives of the state legislature are identical to the overriding purpose of section 205(e) of the FAA Act (protecting consumers from misleading wine labels), "in the absence of preemptive intent, the fact that [the] BATF may have balanced federal policies and arrived at a particular result does not prevent California from considering its own local policies and needs and passing its own [more stringent] laws." Finally, the Department and the NVVA observe that the BATF apparently never contemplated, much less rejected, any area-specific exemption from the federal grandfather clause, such as is found in section 25241's special Napa County labeling rule. The NVVA concludes, "There is no evidence that [the] BATF considered the limited consumer protection provided by the grandfather clause to be sufficient to protect consumers in all cases, or intended to prevent states from

preventing the kind of abuses which Bronco and other opportunistic winemakers could perpetuate under the grandfather clause."

In view of Bronco's repeated suggestions that we should be influenced in our assessment by the circumstance that the federal regulations at issue are part of a comprehensive scheme, in resolving these conflicting views concerning whether section 25241 stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress we bear in mind the high court's admonition in *Hillsborough County, supra*, 471 U.S. 707, 717: "We are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence. See *Jones[, supra]*, 430 U.S. [519] at 525. [¶] Moreover, *because agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and responses to comments, we can expect that they will make their intentions clear if they intend for their regulations to be exclusive*." (Italics added.)

In addition, we are guided by the high court's observation in *Crosby, supra*, 530 U.S. 363, 373, that what constitutes a "sufficient obstacle [for a finding of implied preemption] *is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects*." (Italics added.) The high court also has explained that our inquiry in this regard "requires us to consider the relationship between state and federal laws *as they are interpreted and applied, not merely as they are written*." (*Jones, supra,* 430 U.S. 519, 526, italics added.)

We question Bronco's characterization of the state statute as prohibiting "precisely what [the regulation establishing the grandfather clause] *authorizes*." (Italics added.) As the NVVA asserted at oral argument and as we observed in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 183 [83 Cal.Rptr.2d 548, 973 P.2d 527], "[t]here is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." In our view it is more accurate to characterize the state statute as prohibiting—with respect to Napa County— what the federal regulation's grandfather clause *does not prohibit*.

In any event, Bronco's repeated emphasis upon an alleged federal "authorization" presents a myopic and oversimplified analysis. The crucial

question is, instead, whether the state rule would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Turning to *that* question, we agree with the Department and the NVVA that section 25241 is consistent with Congress's overall purpose in enacting 27 United States Code section 205(e)—that is, to "insure that the purchaser should get what he thought he was getting, [and] that the representations both on labels and in advertising should be honest and straightforward and truthful." (Hearings before House Com. on Ways and Means on H.R. No. 8539, Fed. Alcohol Control Act, (1935), testimony of Joseph H. Choate, former Chairman of FAC Admin., 74th Cong., 1st Sess., at p. 10; H.R. Rep. No. 1542, 74th Cong., 1st Sess., p. 3 (1935) [highlighting deceptive labeling practices]; 79 Cong. Rec. (1935) 11714 [same].) The state statute also is consistent with the recognition that the FAA Act was necessary in order to "do something to supplement legislation by the States to carry out their own policies" because the states "alone cannot do the whole job." (Remarks of Rep. Cullen on H.R. No. 8539, 74th Cong., 1st Sess., 79 Cong. Rec. (1935) 11714.) For the reasons set forth above by the Department and the NVVA, we find that section 25241 does not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

In reaching this determination, we also are persuaded by the apparent congressional and regulatory acquiescence in California's long-standing regulations applicable to the labeling of wines produced in California. This acquiescence militates against concluding that California's section 25241, enacted in 2000, constitutes a "sufficient obstacle" supporting a finding of implied preemption based upon a theory of frustration of federal purpose. Indeed, any doubt that we may have had in this regard is dispelled by the related history of Oregon's corresponding geographic brand-name labeling regulation, which, as explained above, since 1977 has imposed a rule far stricter than the federal rule that existed in the mid-1970s and, like the California statute now under review, also established a regulation far more stringent than that set forth, effective in 1986, under the federal grandfather clause. In other words, like the California statute, the Oregon brand-name regulation prohibits for certain Oregon names what the federal grandfather does not prohibit.

As explained above, the BATF long has been aware of these stricter state law brand-name labeling regulations, and, far from suggesting that their enforcement would frustrate any federal purpose,[71] the BATF expressly has stated its understanding that such labeling regulation will be enforced by the states. In this setting, the BATF's failure to question the enforcement of these

---

[71] We note that the BATF has not been reluctant to commit its thoughts to public view through publication of proposed rules and related comments in the Federal Register.

more stringent state regulations—while instead acknowledging generally the propriety of such regulations—suggests that the BATF, the expert body charged with the enforcement of 27 United States Code section 205(e), does not view these state regulations as being preempted by federal law, and also does not view them as posing an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (See, e.g., *Hillsborough County, supra*, 471 U.S. 707, 721 [because "the agency has not suggested that the county ordinances interfere with federal goals, we are reluctant in the absence of strong evidence to find a threat to the federal goal of ensuring sufficient plasma"]; accord, *Granite Rock Co., supra*, 480 U.S. 572, 582–583 ["If, as Granite Rock claims, it is the federal intent that Granite Rock conduct its mining unhindered by state environmental regulation, one would expect to find the expression of this intent in these Forest Service regulations"].)

 We find nothing in the history of the underlying federal statute or the federal regulations suggesting that, although the BATF may have determined that as a *general matter* its grandfather clause was appropriate so as to avoid destroying an "entire class" of brand-name labels, states would or should be precluded from adopting more stringent brand-name labeling requirements as necessary to address local concerns. (See *Olszewski, supra*, 30 Cal.4th 798, 815 [the presumption against preemption " 'reinforces the appropriateness of a narrow reading of' " assertedly preempting language]; accord, *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 518 [120 L.Ed.2d 407, 112 S.Ct. 2608]; *Medtronic, supra*, 518 U.S. 470, 485; cf. *Exxon, supra*, 437 U.S. 117, 132 ["it is illogical to infer that by excluding certain competitive behavior from the general ban against discriminatory pricing, Congress intended to pre-empt the States' power to prohibit any conduct within that exclusion"].) For the reasons set forth above, we conclude that the state labeling rule in question does not frustrate Congress's intent or stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[72]

---

[72] For similar reasons, we find unpersuasive the related arguments of amici curiae on behalf of Bronco that section 25241 stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, because the statute assertedly (i) "impairs the long-standing national policy favoring uniform and consistent federal wine labeling regulations," (ii) "impairs the consistent federal policy permitting continued use of established brands," and (iii) "will frustrate the United States' ability to protect established brands and trademarks in ongoing trade negotiations."

2. *Does section 25241, by imposing additional conditions not required for the issuance of a federal COLA, stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress?*

Bronco also asserts that section 25241 is impliedly preempted because, it is claimed, the statute imposes additional conditions not required by federal COLAs and thereby nullifies an asserted "right" or federal "license" to market wine in interstate and foreign commerce. In support, Bronco relies upon numerous cases holding, on the facts presented, that a state may not, by its own regulations, impair rights granted under a federal license or permit. (E.g., *Gibbons v. Ogden* (1824) 22 U.S. 1 [6 L.Ed. 23] [federal steamboat license preempted New York statute barring passage between New Jersey and New York]; *Ray, supra,* 435 U.S. 151, 164–165 [federal permit authorizing a vessel to carry cargo in United States waters prevails over the contrary state judgment]; *Sperry v. Florida* (1963) 373 U.S. 379, 385 [10 L.Ed.2d 428, 83 S.Ct. 1322] [state statute barring unauthorized practice of law could not be applied to nonlawyers licensed under federal law to prosecute patents]; *Leslie Miller, Inc. v. Arkansas* (1956) 352 U.S. 187, 188–190 [1 L.Ed.2d 231, 77 S.Ct. 257] [state licensing law could not be applied so as to effectively allow state to declare "irresponsible" a contractor certified by the federal government as "responsible"]; *Castle v. Hayes Freight Lines, Inc.* (1954) 348 U.S. 61, 64 [99 L.Ed. 68, 75 S.Ct. 191] [state could not bar federally licensed truck driver from its roads for repeated violations of state traffic laws]; *First Iowa Coop. v. Power Comm'n* (1946) 328 U.S. 152, 164–167 [90 L.Ed. 1143, 66 S.Ct. 906] [federal permit issued for interstate utility project precluded state attempt to proscribe project].)

The Department and the NVVA, asserting that these cases are distinguishable, rely upon other high court cases holding that, in certain circumstances, possession of a federal license does not confer immunity "from the operation of the normal incidents of local police power." (*Huron Cement Co. v. Detroit* (1960) 362 U.S. 440, 447 [4 L.Ed.2d 852, 80 S.Ct. 813] [upholding enforcement of city's smoke abatement ordinance against federally licensed vessels]; see also *Florida Avocado, supra,* 373 U.S. 132, 141 [upholding California's right to enforce regulations prohibiting the sale of certain federally approved Florida avocados]; *Medtronic, supra,* 518 U.S. 470, 492–494 [federal approval of medical device did not preempt state action claiming the approved device was defectively designed]; *Granite Rock Co., supra,* 480 U.S. 572, 582–583 [federal approval of mining project did not preempt California's stricter environmental requirements]; *Pacific Gas & Elec. v. Energy Resources Comm'n* (1983) 461 U.S. 190, 222–223 [75 L.Ed.2d 752, 103 S.Ct. 1713] [federal nuclear power plant license did not preempt stricter state licensing requirements].)

These licensing cases in essence present the same issue discussed above, namely, whether the state regulation stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. But as both the Department and the NVVA observe, it is quite doubtful that a federal COLA issued pursuant to 27 United States Code section 205(e) and the corresponding wine label certificate regulations (27 C.F.R. § 4.50 et seq.) are equivalent to the licenses or permits at issue in the cases upon which Bronco relies, and Bronco does not provide any convincing authority suggesting that a COLA constitutes a license or permit as understood in those cases. Indeed, it is apparent from the FAA Act itself, and from the corresponding regulations, that both Congress and the BATF well understand the distinction between a license or permit, on one hand, and a COLA, on the other. Congress requires wine importers, producers, and wholesalers to secure a "basic permit" (27 U.S.C. § 203(a)–(c); see also *id.*, § 204 [setting forth permit procedures]), and the BATF has adopted extensive corresponding regulations concerning such permits (27 C.F.R. §§ 1.20–1.59). By contrast, nowhere in the separate COLA procedures set forth in 27 United States Code section 205(e), or the extensive COLA regulations (27 C.F.R. §§ 4.50–4.52, 13.1–13.92), does Congress or the BATF even *imply* that a COLA constitutes a license or permit. Quite the contrary.

■ As explained above, it is evident that the BATF envisions that states will enforce their own labeling laws to the extent they impose more stringent requirements, and that BATF generally views its role as being confined to ensuring compliance with the bare terms of *federal* labeling law. (See, e.g., 51 Fed.Reg. 3773, 3774, discussed *ante*, at pt. II.C.2.b.) As the NVVA observes, the BATF itself has confirmed this view of its enforcement authority and of any resulting COLA that it issues by noting, on its COLA application form, that the BATF uses the form only for its own federal enforcement duties but that it may share the information supplied to *state regulators* "to aid in the performance of their duties." (Dept. of Treas., Alcohol and Tobacco Tax Trade Bur., Application for and Certification/Exemption of Label/Bottle Approval, TTB F 5100.31 (4/2004), p. 3 <http://www.ttb.gov/forms/5000.htm # alcohol> [as of Aug. 5, 2004].)

■ Nor, contrary to the assertions of Bronco and suggestions by the Court of Appeal below, can a COLA properly be viewed as conferring a "right" on the holder to market wines in interstate or foreign commerce so long as the bare BATF labeling regulations are satisfied. The BATF itself has observed that a "certificate of label approval was never intended to convey any type of proprietary interest to the certificate holder" and that a certificate " 'is issued for [B]ATF use only . . . .' The certificate of label approval is a statutorily mandated tool used to help the [B]ATF in its enforcement of the labeling requirements of the FAA Act." (64 Fed.Reg. 2122, 2123 (Jan. 13, 1999).) As the New Jersey Supreme Court observed in a related context, a

COLA "goes no further than evidencing compliance with [federal regulatory] standards imposed only for the purposes mentioned in the valid exercise of federal authority." (*Boller Beverages, Inc. v. Davis* (1962) 38 N.J. 138 [183 A.2d 64, 69].)

### III.

Bronco has failed to carry its burden of demonstrating federal preemption of a long-established and legitimate exercise of state police power with respect to the subject regulated by section 25241. As we have seen, there is no express preemption in the present context, and Bronco's assertions of implied preemption are contradicted by the long history we have described of concurrent state and federal regulation of wine labels including, historically, the representations appearing on labels suggesting the place of origin of the grapes used to make wine. Nor has Bronco succeeded in providing any persuasive indication that this long-standing concurrent regulatory scheme no longer is compatible with Congress's overall purposes which have been to support the states' efforts to protect consumers from misleading labeling, not to permit the type of labeling at issue here. Finally, Bronco has not established that, by purchasing a brand name that had been used prior to 1986, it acquired a federally recognized right or license exempting it from stricter state regulation.

California is recognized as a preeminent producer of wine, and the geographic source of its wines reflecting the attributes of distinctive locales, particularly the Napa Valley—forms a very significant basis upon which consumers worldwide evaluate expected quality when making a purchase. We do not find it surprising that Congress, in its effort to provide minimum standards for wine labels, would not foreclose a state with particular expertise and interest from providing stricter protection for consumers in order to ensure the integrity of its wine industry.

For the reasons set forth above, we reverse the judgment of the Court of Appeal and remand the case to that court to enable it to address Bronco's remaining claims.

Kennard, J., Baxter, J., Chin J., Brown, J., Moreno, J., and Swager, J.,[*] concurred.

Petitioner's petition for a rehearing was denied October 13, 2004, and the opinion was modified to read as printed above. Werdegar, J., did not participate therein.

---

[*]Associate Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice persuant to article VI, section 6 of the California Constitution.